[Nos. B230987, B233283. Second Dist., Div. One. Mar. 28, 2012.]

In re D.A., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
M.C. et al., Defendants and Respondents;
C.R., Intervener and Appellant.

## COUNSEL

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Intervener and Appellant.

No appearance for Plaintiff and Respondent.

No appearance for Defendant and Respondent M.C.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Respondent E.A.

## OPINION

**ROTHSCHILD, J.**—In this juvenile dependency case, the six-month-old minor, D.A., was detained from his mother, M.C. (mother), and placed

with E.A., whom the trial court ruled was D.A.'s presumed father although E.A. and mother had never married or attempted to marry, E.A. had lived with mother for just two weeks before and two weeks after D.A. was born, and mother suspected that E.A. was not D.A.'s biological father. Subsequent genetic testing revealed that another man, C.R., is D.A.'s biological father. C.R. and mother are now engaged to be married.

Since being identified as D.A.'s biological father, C.R. has consistently sought to be determined to be D.A.'s presumed father and has sought visitation. The trial court has consistently denied those requests and, until recently, ordered C.R. to have no contact at all with D.A. Under the most recent order contained in the record on appeal, C.R. is now allowed no more than two visits per month, monitored by the Los Angeles County Department of Children and Family Services (DCFS).

C.R. appeals from the trial court's rulings on paternity issues and visitation. We conclude that the court's denial of C.R.'s request to be determined to be a presumed father of D.A. is not supported by substantial evidence, and that the court's determination that E.A. is a presumed father of D.A. is likewise not supported by substantial evidence. We accordingly reverse with directions and remand for further proceedings.

## BACKGROUND

C.R. and mother were involved in an intimate and exclusive relationship that ended in approximately 2003. In approximately early 2008 they resumed a sexual but nonexclusive relationship. In early 2009, mother also began an intimate relationship with E.A. At some point in 2009, when her relationship with E.A. became more serious, mother ceased all contact with C.R. for several months.

At some point in 2009, mother informed E.A. that she might be pregnant. He took her to get a pregnancy test, which confirmed the pregnancy. She told him that he was the father, and he believed her.

Several months into the pregnancy, mother contacted C.R., told him she was pregnant, and told him that he might be the father of the child but that she was not sure. C.R. told her that he wanted a paternity test as soon as the child was born, and he offered to help her with any expenses associated with the pregnancy, childbirth, or the baby. He also took mother to two doctor visits during the pregnancy, at one of which they learned that she was carrying a boy.

Soon after the second doctor visit, however, mother disconnected her phone, leaving C.R. with no other phone number to contact her directly. C.R.

repeatedly attempted to reach mother by calling the maternal aunt in order to "find out how the pregnancy was going" and to see if he "could help and participate in the process," but the maternal aunt always either refused to answer his calls or refused to allow him to speak to mother. According to C.R., he had no other way of contacting mother.

Also during the pregnancy, mother told E.A. that E.A. was not the father. According to E.A., he and mother "were not getting along" at the time, so he did not believe her and "thought she was just saying this to get back at" him.

Late in the pregnancy, mother and E.A. resolved their differences. About two weeks before the baby was born, E.A. moved in with mother at the home of the maternal grandmother. He took mother to some prenatal appointments and was present at the hospital when D.A. was born in November 2009.

Also on the day D.A. was born, C.R. called the maternal aunt and was informed that mother was at the hospital in labor. He asked if he could speak to mother and asked where she was giving birth, but the maternal aunt refused to give him any more information.

D.A.'s birth certificate, signed by mother, lists E.A. as the father. Mother subsequently informed C.R., however, that D.A. was "more developed" at birth than was expected and that she consequently believed that C.R. "almost definitely was the father" (presumably because of the timing of her relationships with C.R. and E.A.). Mother similarly informed DCFS that because of her due date and date of conception she believed that D.A.'s "father may be [C.R.]"

Two weeks after D.A. was born, mother asked E.A. to move out, which he did. According to E.A., he "continued to provide all of [D.A.'s] basic necessities and had regular and ongoing contact with [D.A.]," and on some unspecified number of occasions mother "drop[ped] [D.A.] off for overnights while she was out partying and pick[ed] him up the next morning."

A few months after D.A. was born, mother contacted C.R., who "begged to see her and the baby." She agreed, and they met at a restaurant and then went back to C.R.'s home, where C.R. introduced D.A. to members of his family. C.R. again told mother that he wanted a genetic test to determine whether he was D.A.'s father. Mother agreed but, according to C.R., "kept making excuses why it couldn't be done right away." C.R. located a company on the Internet that he intended to use for the test, but one week later, before the test could be performed, D.A. was detained.

The following incident gave rise to D.A.'s detention: In May 2010, when D.A. was six months old, mother and E.A. became involved in a

physical altercation after mother picked up E.A. at work. Apparently E.A. tried to take mother's cell phone after accusing her of "cheating" on him, and she started "screaming" at him and hitting him. He was holding D.A. at the time, and one of mother's blows struck D.A. in the face, giving him a bloody nose. Mother was arrested at the scene, and D.A. was transported by ambulance to a hospital, where he was treated and released to E.A. (The detention report states that according to the hospital records D.A. was diagnosed with a concussion, but the hospital records in the clerk's transcript do not state such a diagnosis.) When sheriff's deputies arrested mother, they found her to be in possession of methamphetamine and a glass pipe, but they believed she was not under the influence.

The day after the altercation, a DCFS social worker interviewed E.A. In addition to describing the altercation of the previous day, E.A. "stated that in the past he had used marijuana and had a current medicinal marijuana prescription." He also stated that he had a criminal record of vandalism and driving under the influence and was currently on informal probation and "taking classes for his DUI ticket."

The social worker also interviewed the maternal grandmother, who said that D.A. resided in her home and that she cared for him when mother was at work. The maternal grandmother "began to cry and stated that [E.A.] might not be the child's biological father. However, she did not know who the child's biological father was." She added that "she never approved of [E.A.] because he had a criminal history, was not responsible as he had not provided for the child and had never lived more than two weeks with the child."

Despite misgivings about E.A.'s criminal history and drug use, as well as uncertainty about his ability "to protect the child from the mother without court intervention," DCFS detained D.A. from mother and released him to E.A.

On May 26, 2010, DCFS filed a juvenile dependency petition alleging that D.A. came within the jurisdiction of the juvenile court under subdivisions (a) and (b) of Welfare and Institutions Code section 300. The petition identified mother as D.A.'s biological mother and E.A. as an alleged father. It stated that D.A. had resided with mother until DCFS intervened and that he was now detained at E.A.'s home. The petition alleged that mother's "physical abuse of the child during the violent confrontation between the parents" and her possession of methamphetamine and a "drug pipe" endangered D.A.'s physical and emotional health and safety. It further alleged that E.A. "has a history of illicit drug use and is a current abuser of marijuana, which renders [him] incapable of providing regular care for the child," endangering D.A.'s physical and emotional health and safety.

Mother was present at the detention hearing on May 26, 2010, but E.A. was not. After the court stated that E.A. "is the presumed father of the child," mother's counsel informed the court that mother and E.A. "were both aware that there is a possibility there is another biological father." The court reiterated that E.A. "is still the presumed father of the child" but never stated the factual or legal basis for that determination. Mother expressed "grave concerns about the child remaining in the care of" E.A. and indicated that E.A. had not been entirely forthcoming with the social worker when discussing his criminal history and present circumstances. The court acknowledged that there were "red flags" in the detention report and directed DCFS to "investigate the situation," including "unannounced visits" to E.A.'s home. The court ordered mother and E.A. to participate in drug rehabilitation and submit to random drug testing. The court ordered E.A. to participate in a "fatherhood group" as well. The court calendared the jurisdiction hearing for July 12.

On July 2, 2010, DCFS filed its jurisdiction report. The report stated that mother believed, on the basis of her conception date and due date, that "the child's father may be [C.R.]" DCFS recommended genetic testing to determine paternity, and on July 2, 2010, a DCFS social worker left a voice mail for C.R. "to ask that he be made available for possible [c]ourt ordered" paternity testing. The report also stated that E.A. "said he would not want to keep the child, if it is determined by DNA that he is not the father."

At the jurisdiction hearing on July 12, 2010, the court ordered E.A. to submit to genetic testing to determine paternity. The court also ordered that D.A. be made available for visits with mother a minimum of three times per week, three hours per visit. The court continued the hearing to September 7, 2010.

On August 31, 2010, the report of E.A.'s genetic testing was filed with the court. It showed that E.A. was not D.A.'s biological father.

In last-minute information for the court filed by DCFS on September 7, 2010, a DCFS social worker reported that on July 15 E.A. "said if the child is not his, he still wants to maintain a relationship with the child, because he signed the birth certificate." E.A. had not, however, signed the birth certificate. The social worker also acknowledged E.A.'s previous position "that if he is not the father, it would not be fair to whoever the biological father is, to try to keep custody from him."

Both E.A. and C.R. were present at the continued jurisdiction hearing on September 7, 2010, and the court appointed counsel for both of them. At C.R.'s request, the court ordered genetic testing to determine whether C.R.

was D.A.'s biological father. C.R.'s counsel informed the court that if C.R. was D.A.'s biological father, then C.R. "would be interested in forming [a] relationship" and would seek "to vacate [E.A.'s] paternity status." The court responded that "[t]he presumptive status will not change if he is found the biological father of the child. What does change is some issue from the district attorney's office called support. [¶] I think it's something you want to discuss with your client because [E.A.] has established himself as the child's father or at least what he has communicated to us from him and he seeks to maintain that status. [¶] And the child is placed with him and he is acknowledging the child is his own and is presumed father of him. He did that by signing the birth certificate." (Presumably the court was misled on that point by E.A.'s incorrect statement to the social worker.) The court added that C.R. "says he didn't know, but he didn't know is never justification in paternity. I don't know or I didn't know I had a child, it's called you should have known." Mother's counsel responded, "Mother disputes that." The court continued the matter to October 28, 2010.

In last-minute information for the court filed by DCFS on October 28, 2010, DCFS reported that the genetic test had determined that C.R. was D.A.'s biological father. DCFS also reported that E.A. had missed two drug tests but that it might have been because he did not have a bus pass.

Mother, E.A., and C.R. all attended the continued jurisdiction hearing on October 28, 2010. The court sustained the petition's allegations that mother's physical abuse of the child during the altercation with E.A., mother's possession of illegal drugs and drug paraphernalia, and E.A.'s history of illicit drug use and current abuse of marijuana endangered D.A.'s physical and emotional health and safety, and that D.A. accordingly was a child described by Welfare and Institutions Code section 300, subdivisions (a) and (b). The court did not, however, remove D.A. from E.A.'s custody. The court again ordered three 3-hour monitored visits per week for mother but gave DCFS discretion to liberalize her visits in various ways, including unmonitored visitation.

At the October 28 hearing, C.R.'s counsel informed the court (in keeping with the written last-minute information provided by DCFS) that the genetic test showed C.R. was D.A.'s biological father and that C.R. "would like to be elevated to presumed status." In addition to requesting a contested hearing on disposition, counsel requested visits with D.A. and the opportunity to brief the paternity issue. In response to those requests, the court asked, "Has your client been a part of his life at all?" Counsel responded, "Your honor, he just found out he is the father." The court asked for input from D.A.'s counsel, who replied that although "[i]t's difficult as [D.A.] does already have a presumed father," counsel "would not [be] reluctant to have [C.R.] start visits

and begin a relationship." The court then ruled as follows: "I am not going to make the ruling until we have ruled on the presumed father as we have not declared him the presumed father. [¶] However, we are waiting for the DNA test and things we are looking at and purely legal considerations and we will do that when we return and I will determine whether or not I am going to allow visits but I am not going to at this point." It is not clear why the court said "we are waiting for the DNA test . . . ," because the court had already been informed both orally and in writing that C.R., not E.A., was D.A.'s biological father. At the close of the hearing, C.R.'s counsel stated, "Please note my objection to [C.R.] not being granted any visitation," and the court responded, "Yes, not at this time."

The court continued the matter for a contested hearing on disposition, originally set for December 10, 2010. The court's order further provided that "the issue regarding whether [C.R.] can be a presumed father is to be argued" at the disposition hearing. The court ordered briefs on the issue to be filed by November 15 and responses by December 10.

At the December 10 hearing, the court continued the matter to February 2, 2011, and set a new briefing schedule on the paternity issues. C.R. again asked for visits with D.A. Mother requested unmonitored visits, but E.A. opposed her request on the ground that mother "will use her visits to get around the no visitation order" with respect to C.R. The court initially seemed inclined to grant C.R.'s request ("I am going to order some visits for [C.R.]") but ultimately rejected it. The court granted DCFS discretion to liberalize mother's visits but ordered that C.R. not be present. C.R.'s counsel reiterated C.R.'s request for monitored visits, stating that C.R. "very much wants to be a part of [D.A.'s] life," but the court denied the request ("I am not ordering visits.").

On January 5, 2011, C.R. timely filed his motion to be declared D.A.'s presumed father and to set aside the determination that E.A. was D.A.'s presumed father. He argued that he was D.A.'s presumed father under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*). He further argued that in light of the conflict between his presumption of paternity and E.A.'s, the court must resolve the conflict pursuant to Family Code section 7612 and should resolve it in favor of C.R.[1]

On the day of the hearing, February 2, 2011, E.A. timely filed opposition to C.R.'s motion. E.A. argued that *Kelsey S.* was distinguishable because in that case there was no nonbiological presumed father. He also argued that in view of C.R.'s statements "that he had a good faith belief that he may be the

---

[1] All subsequent statutory references are to the Family Code unless otherwise indicated.

father," he could have earlier "commence[d] an action to secure the status that he is now seeking." E.A. also argued that if C.R. were determined to be a *Kelsey S.* father, then the conflict between the presumptions should still be resolved in E.A.'s favor.

At the disposition hearing on February 2, 2011, mother's counsel informed the court that mother "has been fully compliant with the orders of the court," including a parenting class, drug rehabilitation, random drug testing (all tests negative), and domestic violence, anger management, and relapse prevention classes. The criminal charges against her, arising from the altercation that led to D.A.'s detention, were dismissed, and she had been "enjoying unmonitored visits with [D.A.] since the end of December and those visits have been going well." She requested that D.A. be placed "home of parents."

DCFS requested that the "home of parent father" order remain in place because mother "just recently had her visits liberalized to unmonitored" and had not yet had any overnight visits, and her home had not been assessed. In addition, DCFS wanted to "assess the situation" of mother's "current relationship with" C.R. before the court gave mother even shared custody of D.A.

D.A.'s counsel stated that "[g]iven mother's compliance, . . . it's appropriate to have her regain custody of her child," though there should be "a period of transition for the child given that she has not had any overnights." D.A.'s counsel added, "[t]his is provided that [C.R.] is not living with her."

E.A.'s counsel asked that D.A. "remain in his custody," but "[w]hen the court deems it appropriate, he has no problem sharing the custody 50-50 with the mother." E.A. continued to request, however, that D.A. have no contact with C.R., because "that will further confuse the child and the court has made the finding that [E.A.] is [the] presumed father and he wishes to be the father from now until forever." He opposed "the court making any orders to include [C.R.] in the case plan" and asked that the court determine that C.R. "is not the presumed father" and that C.R. no longer be a party to the proceedings and that his counsel accordingly be relieved.

C.R.'s counsel informed the court of C.R.'s desire for "the opportunity to reunify with the child" and stated that C.R. "is willing to participate in whatever services that the court will be willing to order. He would like very much to have visitation. He is willing to prove himself to the court."

The court asked whether mother and C.R. were "in a relationship with each other" at present. Mother confirmed that they were. The court then ruled as follows: "So that the three of you are clear about what has occurred here and what may occur here. It's important to understand that [E.A.] is the presumed

father of this child. [¶] The presumption of paternity is entirely in his favor and the court has ruled on that in light of what we heard this morning. [¶] [C.R.] is what we call a mere biological father of the child. It's important to note that the mother and [C.R.] are in a relationship with each other. [¶] That even if [C.R.] were not the mere biological father being in that relationship with the mother could give him the standing of a stepfather depending upon how they define relationship. [¶] So it[] becomes important for you, [E.A.], to recognize those realities and deal with them. The court is concerned about the issue of safety and protection of the children and making sure that any orders that the court makes [don't] pose a risk to this child. [¶] I don't know very much about you, [C.R.], and the department needs to know more about you before we can allow you to have any contact with this child. [¶] The department and the court need[] to know more about your relationship with the mother, and we don't know very much about it and we don't want to expose the child to a situation tentative or temporary or may indeed pose a risk to the child. [¶] So we need a further assessment of the mother and her situation before we make the disposition orders that mother is requesting. [¶] It does appear, however, that we are moving in that direction, but before we move in that direction, we will have to assess the relationship and assess [C.R.]" The court ordered mother, E.A., and C.R. to participate in the Parents Beyond Conflict program. D.A. continued to be placed with E.A., with family maintenance services for E.A. and family reunification services for mother (for both of them, "drug rehab with random testing, domestic violence counseling, parenting, individual counseling and . . . comply with all of the orders of the criminal court"). Mother could still have unmonitored and overnight visits as long as she and C.R. were not living together, and C.R. was still ordered to have no contact with D.A. The court also ordered C.R. to "enroll in the fatherhood program and to enroll in parenting." And the court ordered DCFS "to assess [C.R.]" as well as the possibility of placing D.A. with mother, and the court calendared a further hearing on March 23, 2011, to review that assessment and DCFS's report on the parties' progress.

The court neither orally nor in its minute order referred to C.R.'s motion. At the close of the hearing, C.R.'s counsel stated, "Please note our objection to the court not granting my motion," and the court replied, "I think we did that earlier."

C.R. timely appealed from the court's orders of February 2, 2011.

DCFS filed its report on March 23, 2011. It found no safety concerns in the home of the maternal grandparents and recommended that D.A. be placed with mother upon verification that she resides in the maternal grandparents' home. The report indicated that C.R. was participating in the ordered programs, and it stated that he submitted to a live scan but the results had not

been received. The report said nothing about the status of the relationship between mother and C.R., and it stated that the court had not issued an order identifying either E.A. or C.R. as either a presumed or an alleged father of D.A. DCFS recommended that the court "rule on the paternity of [D.A.]" and grant visitation to both E.A. and C.R.

Mother and C.R. were present at the hearing on March 23, 2011, but E.A. was not. At the hearing, the court indicated that the report erred by stating that neither E.A. nor C.R. had been identified as a presumed or an alleged father, and counsel for DCFS conceded the error and acknowledged that the court had previously found that E.A. "is the presumed father" and C.R. is "an alleged father and biological father." Counsel for DCFS requested that the minute order expressly provide that E.A. is the presumed father and C.R. is a mere biological father, and the court granted the request.

C.R. requested visitation. Mother requested that D.A. be placed with her, with visitation for both E.A. and C.R. E.A. objected to placement of D.A. with mother but agreed to placement with both mother and E.A., with "shared physical and legal custody." Counsel for D.A. recommended placement with both mother and E.A. because "mother has been in compliance and doing well and visiting the child[] appropriately."

The court terminated the placement with E.A., ordered D.A. placed with both mother and E.A., and ordered that mother and D.A. reside with the maternal grandparents whenever mother had custody. The court ordered DCFS to "sit down with" mother and E.A. "to work out the custody split." The court again ordered C.R. to have no contact with D.A. and expressly admonished mother to abide by the no-contact order. The court ordered C.R. to continue to attend the fatherhood group and Parents Beyond Conflict. C.R.'s counsel again asked that the court "note my objection" and added that since the last hearing C.R. "has done exactly what you have asked him to do."

On April 15, 2011, DCFS filed another progress report. The report contained extensive information on C.R., including his family history, criminal history, and present circumstances. The report stated that C.R. has a 10-year-old son, with shared custody by mutual agreement with the boy's mother; C.R. reported he had a "very good relationship" with his son and an "amicable" relationship with the boy's mother. C.R.'s live scan results showed several criminal charges and convictions, but he committed his most recent offense in 2003. In 2004, he began serving a five-year prison term for carjacking. Since his release from prison in 2008, he "has not engaged in any known criminal activity," and he was discharged from parole in 2010. He works for a construction company as a crew chief and has been working for

that same employer since December 2008. "[H]e enjoys his job and plans to continue with this company as long as possible." He was enrolled in and attending all of the programs ordered by the court. The report also noted that after twice attempting to meet with mother and E.A. to work out the custody split, a DCFS social worker met with mother and "devised a calendar." The report recommended that C.R. be granted monitored visitation, with the visits to be monitored by the maternal grandmother in her home.

Attached to the report was a letter to the court from C.R. In it, he described the history of his relationship with mother and his efforts to be involved in D.A.'s life. He also stated that he and mother were engaged and were planning to marry "soon." He closed by saying he is "a very hard working man trying to get my family back together to give them the life they deserve," and he requested "the opportunity to prove myself to everyone that I am very interested in recupperating [sic] my son and family. I am willing to do whatever it takes."

The court conducted another hearing on April 15, 2011, the same day the progress report was filed. Mother and C.R. attended, but E.A. did not. Mother's counsel stated that E.A. did not attend the scheduled meeting with the social worker to arrange the custody split. Counsel suggested that the issue should be mediated, and the court so ordered. C.R.'s counsel, in keeping with DCFS's recommendation, requested monitored visits, adding, "My client is doing everything aboveboard. Everything the court has asked. He is engaged to the mother. They are soon to be married. He is the biological parent of this child. He just wants to have monitored visits." Counsel for D.A. joined the request for monitored visits for C.R. E.A. opposed the request, reminding the court of its previous concerns that C.R. "is here today, perhaps he is gone tomorrow, we don't really know how stable this relationship is." C.R.'s counsel responded, "And to that end my client has been here every single time since September 7, 2010, when I was appointed. He has not missed a single court date and he has enrolled in everything the court has asked." The court ordered visitation for C.R., no more than twice per month, to be monitored by DCFS and with no discretion to liberalize.

E.A. did not attend the court-ordered mediation on May 25, 2011, so no mediation took place. The court continued the matter to August 2, 2011, and all prior orders remained in effect.

C.R. timely appealed from the court's March 23 and April 15 orders. We consolidated the appeal with his earlier appeal from the court's orders of February 2, 2011.

## DISCUSSION

### I.  C.R. Is a Presumed Father of D.A. Under *Kelsey S.*

C.R. argues that the trial court erred when it implicitly denied his motion to be determined to be a presumed father of D.A. under *Kelsey S.* We agree.

■ "The Uniform Parentage Act (UPA), Family Code section 7600 et seq., provides the statutory framework for judicial determinations of parentage, and governs private adoptions, paternity and custody disputes, and dependency proceedings." (*In re M.C.* (2011) 195 Cal.App.4th 197, 211 [123 Cal.Rptr.3d 856], fn. omitted.) "The UPA distinguishes between 'alleged,' 'biological,' and 'presumed' fathers." (*Ibid.*) "Presumed father status ranks highest." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801 [116 Cal.Rptr.2d 123].) "[O]nly a presumed . . . father is a 'parent' entitled to receive reunification services under [Welfare and Institutions Code] section 361.5." (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451 [24 Cal.Rptr.2d 751, 862 P.2d 751].)

■ "Section 7611 sets forth several rebuttable presumptions under which a man may qualify as a presumed father . . . ." (*In re M.C., supra,* 195 Cal.App.4th at p. 212.) Case law holds, however, that under certain circumstances a man may acquire all of the rights of a presumed father without meeting the requirements of any of the statutory presumptions. Under *Kelsey S.,* "an unwed biological father who comes forward at the first opportunity to assert his paternal rights after learning of his child's existence, but has been prevented from becoming a statutorily presumed father under section 7611 by the unilateral conduct of the child's mother or a third party's interference" acquires a status "equivalent to presumed parent status under section 7611." (*In re M.C., supra,* 195 Cal.App.4th at pp. 213, 220; see *In re Elijah V.* (2005) 127 Cal.App.4th 576, 583 [25 Cal.Rptr.3d 774].) "We review a juvenile court's determination of presumed parentage status under the substantial evidence standard." (*In re M.C., supra,* 195 Cal.App.4th at p. 213.)

■ The record contains no evidence that C.R. fails to qualify as a presumed father under *Kelsey S.* It is undisputed that he is D.A.'s biological father and that he and mother have never been married. During mother's pregnancy he expressed his desire for a genetic test to determine whether he was the baby's father, he took mother to prenatal medical appointments, and he offered to help with any associated expenses. His involvement ended only because mother cut off contact with him, the maternal aunt refused to give him any information about mother, and he had no other way of reaching her. After D.A. was born, mother contacted C.R., and he "begged" to meet D.A.,

did meet him, and again requested a paternity test; none was performed before D.A.'s detention, however, because of mother's delays. After D.A. was detained and genetic testing determined that E.A. was not D.A.'s biological father, C.R. was present at the very next hearing on September 7, 2010, and informed the court that if he was D.A.'s biological father then he would want to "form[] a relationship" with D.A. and would seek to vacate E.A.'s paternity status. The genetic test results showing that C.R. is D.A.'s biological father were filed with the court on October 28, 2010. C.R. was present at the hearing on the same day, informed the court that he wished to be determined to be D.A.'s presumed father, and requested visitation. He has been present at every hearing since then. He timely moved to be determined to be D.A.'s presumed father and to set aside E.A.'s paternity status. He has consistently requested visitation, and he has complied with all orders of the court. In sum, all of the evidence weighs in favor of granting him presumed father status under *Kelsey S.*, and none weighs against.

E.A.'s arguments to the contrary lack merit. For example, E.A. faults C.R. for having asserted, before he was determined to be D.A.'s biological father, that he wished to be a father to D.A. *if the child was his*, in contrast to E.A. who, after initially saying the same thing, later decided that he wished to be a father to D.A. even if they were not biologically related. E.A. cites no authority for the proposition that a *Kelsey S.* father must unconditionally assert his parental rights even before knowing whether the minor is his biological child, and we are aware of none. Rather, the law requires that "[o]nce the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit." (*Kelsey S., supra*, 1 Cal.4th at p. 849.) That is precisely what C.R. did, both before and after D.A. was born.

E.A. also apparently faults C.R. for his lack of involvement during the pregnancy, birth, and first six months of D.A.'s life. The record does not support E.A.'s position, however, because the evidence shows that mother cut off contact with C.R. during the pregnancy and thwarted his attempts to obtain a genetic test after D.A. was born. The record contains no evidence to the contrary.

Finally, E.A. relies on *In re William K.* (2008) 161 Cal.App.4th 1 [73 Cal.Rptr.3d 737], which affirmed a trial court determination that the biological father was not a presumed father under *Kelsey S.* That case is distinguishable, however, because it involved a " 'planned pregnancy' " in which no party was ever in doubt about the identity of the biological father, who nonetheless, when informed of the dependency proceedings, "did not immediately assert paternity but instead responded that he did not know if he was

the minor's father but was willing to take a paternity test to find out." (*In re William K., supra*, 161 Cal.App.4th at pp. 5, 11.) Here, in contrast, all parties were uncertain about the identity of the biological father, and C.R. has consistently sought both genetic testing and involvement in D.A.'s life since before D.A. was born.

For all of these reasons, we conclude that the trial court's denial of C.R.'s motion to be determined to be a presumed father of D.A. under *Kelsey S.* is not supported by substantial evidence, and we accordingly direct the court to grant the motion on remand.

## II. The Determination That E.A. Is a Presumed Father of D.A. Is Not Supported by Substantial Evidence.

C.R. argues that the trial court erred by failing to "set aside" E.A.'s "voluntary declaration of paternity." After reviewing the briefs and the record, we were in doubt as to the existence of any voluntary declaration of paternity or any other basis for the trial court's determination that E.A. is a presumed father of D.A. We accordingly solicited supplemental briefs on the issue of whether the trial court's determination that E.A. is a presumed father of D.A. is supported by substantial evidence. We conclude that it is not.

■ First, the record does not contain a voluntary declaration of paternity executed by E.A. or anyone else. The parties nonetheless contend that because E.A. is listed as the father on D.A.'s birth certificate, he is presumed to have executed a voluntary declaration of paternity. The only basis for such a presumption would be the following: Health and Safety Code section 102425, subdivision (a)(4), provides that "[i]f the parents are not married to each other, the father's name shall not be listed on the birth certificate unless the father and the mother sign a voluntary declaration of paternity at the hospital before the birth certificate is prepared." In addition, Evidence Code section 664 provides that "[i]t is presumed that official duty has been regularly performed." One case has held that because the statutory scheme concerning the preparation of birth certificates and voluntary declarations of paternity imposes certain official duties on hospital staff, under appropriate circumstances the appearance of an unwed father's name on a birth certificate can give rise to a presumption that the mother and father executed a voluntary declaration of paternity, shifting the burden of proof to any party wishing to deny the existence of the declaration. (See *In re Raphael P.* (2002) 97 Cal.App.4th 716, 736–739 [118 Cal.Rptr.2d 610].) No such presumption applies here, however, because the record contains no evidence that the

relevant members of the hospital staff (or any members at all) were aware that mother and E.A. were not married.[2]

Second, E.A.'s supplemental brief describes various facts that E.A. contends show he is a presumed father of D.A., but the brief never cites the statutory presumption to which the cited facts are allegedly relevant. We conclude that the evidence in the record does not support application of any of the statutory presumptions.

■ All of the presumptions recognized under section 7611 are undisputedly inapplicable except for subdivision (d), which provides that a man is a presumed father if "[h]e receives the child into his home and openly holds out the child as his natural child." The record contains no evidence that E.A. met the requirements for application of this presumption before D.A. was detained.[3] When mother was pregnant, she resided with the maternal grandmother. E.A. lived with her at that location for two weeks before and two weeks after D.A. was born. E.A. also claims that, between his departure from the maternal grandmother's home and D.A.'s detention at the age of six months, on some unspecified number of occasions mother "drop[ped] [D.A.] off for overnights while she was out partying and pick[ed] him up the next morning." That evidence is not sufficient to show that E.A. is a presumed father of D.A. "[T]o become a presumed father, a man who has neither married nor attempted to marry his child's biological mother must not only openly and publicly admit paternity, but must also physically bring the child into his home." (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051 [43 Cal.Rptr.2d 445, 898 P.2d 891], italics omitted.) The record contains no evidence that E.A. openly and publicly admitted paternity. The appearance of his name on the birth certificate does not constitute such evidence, because he did not sign the birth certificate and the record contains no evidence that he was even involved in the decision to include his name. E.A.'s declaration filed in support of his opposition to C.R.'s motion to vacate E.A.'s paternity status says nothing about the birth certificate.

For all of the foregoing reasons, we conclude that the trial court's determination that E.A. was a presumed father of D.A. is not supported by substantial evidence.

---

[2] In any event, under the circumstances of this case it would have been an abuse of discretion to deny C.R.'s motion to set aside E.A.'s voluntary declaration of paternity, assuming it exists. (See § 7575; *Gabriel P. v. Suedi D.* (2006) 141 Cal.App.4th 850, 858, 862 [46 Cal.Rptr.3d 437].)

[3] The postdetention evidence is similarly unavailing. D.A. was placed in E.A.'s home by court order, and explicit doubts about E.A.'s paternity were expressed in the detention report and continuously thereafter, with E.A. himself acknowledging the uncertainty by stating initially that it would not be fair for him to keep custody of D.A. if he turned out not to be the boy's biological father.

It follows from our holdings concerning paternity that D.A. has been wrongly kept away from C.R. for nearly all of his young life. On remand, the trial court must remedy this situation forthwith. We accordingly direct the court to enter a new order placing D.A. home of parents, mother and C.R., immediately, unless there has been a material change in mother's or C.R.'s circumstances. The court may, in its discretion, order some temporary visitation with E.A. in order to smooth the transition for D.A.'s benefit.

## DISPOSITION

The superior court's orders (1) finding E.A. to be the presumed father of D.A., (2) finding C.R. to be the mere biological father of D.A., and (3) placing D.A. home of parents, mother and E.A., are reversed. The court is directed to enter a new and different order (1) finding that C.R. is a presumed father of D.A. under *Kelsey S.* and (2) finding that E.A. is not a presumed father of D.A. Unless there has been a material change in mother's or C.R.'s circumstances, the court is further directed to enter an order placing D.A. home of parents, mother and C.R. The case is remanded for further proceedings consistent with this opinion.

Mallano, P. J., and Chaney, J., concurred.

A petition for a rehearing was denied April 16, 2012.