Filed 5/8/14  In re Alvin M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Alvin M., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. WINSTON M., Defendant and Appellant. | A138277 (San Francisco County Super. Ct. No. JD123233) |

**I.  INTRODUCTION**

Appellant Winston M. is the biological father of Alvin M., the minor who is the subject of this dependency proceeding.  He appeals from the juvenile court's order denying his motion for presumed father status and its jurisdiction and disposition orders, contending the order denying him presumed father status is not supported by substantial evidence and that he met his burden of proving he was and is committed to assuming parental responsibility.  We find no error and affirm the juvenile court's orders.

## II. FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Dependency Petition.*

In August 2012,[1] the San Francisco Health and Human Services Agency (Agency) filed a Welfare and Institutions Code section 300[2] petition alleging that newborn Alvin M. was a child coming within the jurisdiction of the juvenile court under subdivision (b), failure to protect.  The petition alleged several grounds placing the child at risk of harm including:  (1) Alvin's mother[3] had a substance abuse problem requiring assessment and treatment; she admitted to smoking marijuana while pregnant and to using crystal methamphetamines in the past; (2) mother and Alvin tested positive for marijuana and methamphetamines at the time of his birth; (3) Alvin exhibited withdrawal symptoms and appeared underweight at birth; (4) neither mother nor the alleged father (i.e., appellant) had appropriate housing for a newborn and the Agency had been unable to make an assessment of their current residence; (5) mother had a criminal history; (6) the alleged father had a substance abuse problem; and (7) the alleged father had a criminal history including incarceration.

The Agency's detention report was filed the same day as the petition.  The report stated that mother was taken by ambulance to the hospital two days earlier, complaining of abdominal pain.  She reported being pregnant with twins.  Paramedics noted that she was under the influence, nodding off, and her eyes were " 'pinpoint.' "  She and the friend who accompanied her (not appellant) both "reeked" of marijuana.  Mother admitted she had been smoking marijuana, and that she had smoked crystal methamphetamines in the past.  Mother was nodding off during delivery of a single baby.  Mother and baby tested positive for marijuana and methamphetamines.

The alleged father, appellant, arrived at the hospital during this time.  Hospital staff had to tell him "to 'back off' in the delivery room as he was being 'very aggressive

---

[1] All further unspecified dates are in 2012.

[2] All further unspecified statutory references are to the Welfare and Institutions Code.

[3] Alvin's mother is not a party to this appeal.

with staff.' " Other hospital staff members stated that the parents "seemed 'really chaotic.' " Fearing that appellant would try to take the baby, staff alerted hospital security and a police hold was placed on the child.

The Agency's social worker tried to interview the parents at the hospital that day. Appellant appeared " 'high as a kite.' " The worker explained the police hold on the baby and that, in addition to an interview, the Agency had to conduct a home assessment before the baby would be discharged. Appellant kept "nodding off" and struggled to stay awake and focused.

The social worker interviewed appellant again at the hospital the next day. Appellant admitted a history of using marijuana and methamphetamines, but denied using methamphetamines recently. He admitted to using marijuana with the mother. He acknowledged having participated in several drug rehabilitation programs and having been incarcerated in the past. The social worker discussed residential treatment programs with both appellant and mother.

Neither appellant nor mother could provide an address for a home assessment. Appellant stated that they "had everything" for the baby and that they "planned to go to Sacramento to be close to the grandmother so she could help them with the baby." Appellant claimed to live with the mother in San Francisco, but also said he had an apartment in the Bayview neighborhood that was paid for by his father-in-law. Mother referred to three different addresses where they had items for the baby, two in San Francisco and one in Pittsburg.

On August 23, the court held a detention hearing. Mother appeared at the hearing, but appellant did not. The court appointed counsel for the mother, ordered Alvin detained, and set another hearing for September 6 and a jurisdiction/disposition settlement conference for September 26. Notice was mailed to appellant at a San Francisco address. The notice was returned with a hand-written note on the envelope stating that appellant had not resided at that address for the past two years. The September 6 hearing was continued to September 26.

3

B.      *Jurisdiction and Disposition.*

On September 25, the Agency filed a jurisdiction and disposition report.  By this time, the whereabouts of both mother and appellant were unknown.  Appellant's last contact with the Agency had been two days after Alvin's birth.  The report indicated that appellant's criminal history included arrests in 2008 and 2009 for selling marijuana, possessing cocaine for sale, transporting a controlled substance, and carrying a concealed dirk or dagger.  The Agency referred appellant for random drug testing on August 24, but as of September 11 he had not scheduled an appointment.  The Agency reported that "[t]he alleged father has failed to engage in services, has not visited the child once since his removal and has never appeared in court regarding the child."  Alvin was reported to be jittery, but this symptom could be controlled with swaddling and was expected to soon diminish.  The Agency recommended that Alvin remain in foster care, and that no reunification services be provided to appellant.

The jurisdiction/disposition hearing and settlement conference were continued from September 26 to October 31.  The matter was continued again to November 28.

The Agency located appellant in custody, and sent notice of the November 28 hearing to him at the San Bruno jail.  The notice was sent via certified mail on November 7.  On November 9, counsel was appointed for appellant.

On November 28, the Agency filed an addendum report for the jurisdiction and disposition hearing.  A social worker interviewed appellant on November 15 at the San Bruno jail.  The social worker reported that appellant held himself out as the father of the child, but wanted a paternity test.  Appellant told the social worker that he had used marijuana and methamphetamines in the past, and that he had participated in five substance abuse treatment programs, but had not completed them.  Appellant also stated that he was ordered by the court to complete a treatment program at the Salvation Army after being arrested for selling drugs.  He left the program to be present at Alvin's birth, and was subsequently arrested.  Upon release, he planned to complete a six-month

4

residential drug treatment program in Oakland.[4] He told the social worker that he "really want[ed] to get clean and sober so he can be a father to the child." Appellant reported that he had no source of income or housing. The Agency continued to recommend that no services be provided to appellant. A copy of Alvin's birth certificate was attached to the report; it did not identify a father.

On November 28, the court continued the jurisdiction and disposition hearing to January 10, 2013, after finding that reasonable efforts had been made to locate mother and her whereabouts were unknown. On December 5, the juvenile court ordered a paternity test for appellant. The order listed his address as the San Francisco County jail. The record also contains an "Order for Prisoner's Appearance at Hearing Affecting Parental Rights" for the January 10, 2013, jurisdiction and disposition hearing.[5] The hearing was continued to January 31, 2013.

At a January 31, 2013, settlement conference on jurisdiction and disposition, the court continued the matter for a contested jurisdiction and disposition hearing on February 25, 2013, to be heard in conjunction with a motion by appellant for presumed father status.

C.      *The Presumed Father Petition.*

On February 11, 2013, appellant filed a motion for presumed father status pursuant to Family Code, section 7611, subdivision (d). In support of the motion, appellant submitted his own unsigned declaration.[6]

In his declaration, appellant stated that he had been in a romantic relationship with the mother for about a year when she became pregnant; that once he knew she was pregnant, he "began to collect things for the baby." He called the ambulance when mother went into labor and went with her to the hospital; he was in the delivery room when mother gave birth; and he visited the baby in the hospital over the next three days

---

[4] Appellant was released from custody on or about November 17.

[5] It appears that appellant was released from jail on November 17, but was incarcerated again beginning on November 26.

[6] A signed version of this declaration was filed on March 29, 2013.

until the baby was detained. Appellant stated he had been "incarcerated for almost the entire time since I last saw [the baby] so that I have not been able to see him since he left the hospital."

In his declaration, appellant also stated he was anxious to see his son and was prevented from taking custody by the Agency's intervention. He contacted the mother about seeing Alvin; she told him he would have to go to court. Appellant explained that he did not have an opportunity to go to court before he was arrested on a probation warrant. Appellant also stated that he tattooed Alvin's name on his (appellant's) arm and that he wanted to take care of his son.

On February 14, 2013, the Agency filed an updated addendum report. The report listed the San Bruno jail as appellant's address. According to the report, appellant disclosed that he is the father of another child who had been removed from his mother's care and that he was unsure of the child's whereabouts. The Agency located records involving appellant and the other child, who was removed from his mother three days after his birth in October 2011 due to her use of methamphetamines during her pregnancy, lack of prenatal care, and homelessness, as well as the alleged father's (i.e., appellant's) failure to protect the child from the abuse and neglect of the mother, and his inability to provide proper care and supervision for the child. A paternity test confirmed that appellant is the biological father of that child. According to Agency records, appellant stopped by the hospital once to visit the child after his birth but left when hospital staff approached him about signing the child's birth certificate. Appellant is not listed on the birth certificate. Appellant sought presumed father status and reunification services through his attorney in that case. The court denied both requests after appellant failed to appear in court.

The addendum report also provided information regarding appellant's history of arrests and unsuccessful drug treatment programs, including that appellant was arrested on May 29, 2012, and remained in custody until July 5, when he was placed in the Salvation Army residential treatment program in San Francisco. He left that program four days later, on July 9, and was arrested on October 7. He was taken to another

6

residential drug treatment program on November 20, but left that program after less than one week. He was arrested on November 26 and remained in jail until January 17, 2013, when he was taken to Walden House to begin residential drug treatment. He left the program on the same day, and was arrested on January 18, 2013, for second-degree burglary.

The Agency recommended the court deny reunification services: "Alvin M[.] is the alleged father's second child to be removed from his care. As in the case involving [the other child], the alleged father failed to sign Alvin's birth certificate and has not maintained contact with the [Agency]. Based on the alleged father's repeated unwillingness to engage in residential drug treatment and continued criminal activity, the likelihood of reunification is highly unlikely. [¶] It is recommended that no services be offered to the alleged father as he has not elevated his parental status, he has made no effort to address his substance abuse problem, he continues to be involved in criminal activity and he failed to reunify with a child."

The Agency also opposed appellant's request for presumed father status. The Agency noted that, although appellant was out of custody from July 9 until October 7, he did not appear at the detention hearing in August and offered no explanation for failing to appear and failing to maintain contact with the Agency. The Agency argued that appellant had not lived with Alvin, had not provided any significant financial support, and did not have a strong bond with Alvin, whom he had not seen since shortly after his birth, some six months ago.

On February 20, 2013, the Agency filed an amended juvenile dependency petition to add an allegation under section 300, subdivision (j), to the effect that the biological father (appellant) had another child who was a dependent of the court and whose case was set for a section 366.26 hearing.

On February 25, 2013, the juvenile court entered a judgment of paternity after the test determined that appellant was Alvin's biological father.

Also on February 25, the hearing on appellant's motion for presumed father status took place. After hearing argument from counsel for mother, the minor, appellant, and

the Agency, the court denied the motion, stating that, based on "what is in the best interest of this child," and "after looking at the various reports that have been filed and also taking into consideration what the law says and what it takes to become a presumed parent, a father, I am of the view that at this point [appellant] has not accomplished that, and I am denying the motion." The court continued the jurisdiction/disposition hearing.

D.      *Subsequent Proceedings.*

According to a declaration of due diligence, on March 15, 2013, the Agency located appellant in custody at the San Francisco County jail.

On March 29, 2013, the parties reached agreement regarding the jurisdictional allegations in the first amended petition. Under that agreement, the court sustained allegations regarding mother's drug use, mental health issues, and lack of housing, and about appellant's substance abuse problem and failure to complete multiple residential treatment programs. The court also sustained an allegation regarding appellant's criminal history including drug-related convictions and current incarceration, but not including the claim that he was facing a burglary charge. Finally, the court sustained the allegation under subdivision (j) that appellant's parental rights to his other child had been terminated.

The Agency requested that no services be provided to appellant and that a section 366.26 hearing be set as to him. Minor's counsel joined the Agency's argument. Appellant's counsel requested discretionary services. The court denied services to mother under section 361.5, subdivision (b)(1). It denied services to appellant based on the best interest of the child. The court set a six-month review date to allow mother time to come forward.

On April 2, 2013, appellant filed a timely notice of appeal.

### III.  DISCUSSION

Appellant argues the juvenile court erred in denying him presumed father status under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).

8

A.      *Legal Principles and Standard of Review*.

" 'The Uniform Parentage Act (UPA), Family Code, section 7600 et seq., provides the statutory framework for judicial determinations of parentage, and governs private adoptions, paternity and custody disputes, and dependency proceedings.' (*In re M.C.* (2011) 195 Cal.App.4th 197, 211, fn. omitted.)  'The UPA distinguishes between "alleged," "biological," and "presumed" fathers.' (*Ibid*.)  'Presumed father status ranks highest.' (*In re Jerry P*. (2002) 95 Cal.App.4th 793, 801.)" (*In re D.A.* (2012) 204 Cal.App.4th 811, 824.)  "Only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services, and only a presumed father is entitled to custody of his child.  ([*In re Zacharia D*. (1993) 6 Cal.4th 435,] 451.)  In contrast, the juvenile court 'may' order reunification services for a biological father if the court determines that the services will benefit the child.  (§ 361.5, subd. (a).)" (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596.)

"[Family Code] section 7611 sets forth several rebuttable presumptions under which a man may qualify as a presumed father." (*In re M.C*., *supra*, 195 Cal.App.4th at p. 212.)  The criteria for determining presumed father status include that the man is married to, or has attempted to marry, the child's natural mother; he has received the child into his home and held the child out as his own; or he and the mother have executed a voluntary declaration of paternity. (Fam. Code, §§ 7611, subd. (a)-(d), 7571, 7573.)  In the juvenile court, appellant unsuccessfully argued for presumed father status under Family Code section 7611, subdivision (d), which provides that a man is a presumed father if he "receives the child into his . . . home and openly holds out the child as his . . . natural child."

Under certain narrow circumstances, however, "a man may acquire all of the rights of a presumed father without meeting the requirements of any of the statutory presumptions.  Under *Kelsey S*., 'an unwed biological father who comes forward at the first opportunity to assert his paternal rights after learning of his child's existence, but has been prevented from becoming a statutorily presumed father under [Family Code] section 7611 by the unilateral conduct of the child's mother or a third party's interference'

9

acquires a status 'equivalent to presumed parent status under section 7611.' (*In re M.C.*, *supra*, 195 Cal.App.4th at pp. 213, 220; see also *In re Elijah V.* (2005) 127 Cal.App.4th 576, 583.)" (*In re D.A., supra,* 204 Cal.App.4th at p. 824.) The *Kelsey S.* court reached this result by finding that the statutory scheme "violates the federal constitutional guarantees of equal protection and due process for unwed fathers to the extent that the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)

In order for a biological father "[t]o satisfy the *Kelsey S.* criteria, [he] must show he promptly stepped forward to assume full parental responsibilities for his child's well-being, the child's mother or some third party thwarted his efforts to assume his parental responsibilities, and that he demonstrated a willingness to assume full custody of the child." (*In re M.C.*, *supra*, 195 Cal.App.4th at p. 220, citing *Kelsey S.*, *supra*, 1 Cal.4th at p. 823.) When determining whether the foregoing requirements have been established, a "court should consider all factors relevant to that determination. The father's conduct both before and after the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849, fn. omitted; see also *In re M.C.*, *supra*, 195 Cal.App.4th at p. 220.)[7]

_____

[7] *Kelsey S.*, an adoption case, was extended to dependency proceedings in *In re Julia U*. (1998) 64 Cal.App.4th 532; see also *In re Jerry P., supra,* 95 Cal.App.4th at pages 810-812 [explaining the constitutional basis for extension to dependency cases]. As observed in *In re M.C.*, *supra*, 195 Cal.App.4th at page 219, "the vast majority of

"The party seeking to establish presumed parent status bears the burden of proof by a preponderance of evidence." (*In re M.C.*, *supra*, 195 Cal.App.4th at p. 216.) Thus, "[t]he burden is on a biological father who asserts *Kelsey S.* rights to establish the factual predicate for those rights." (*In re Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679.)

"We review a juvenile court's determination of presumed parentage status under the substantial evidence standard." (*In re M.C.*, *supra*, 195 Cal.app.4th at p. 213.) " '[W]e review the facts most favorably to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of the order. [Citation.] We do not reweigh the evidence but instead examine the whole record to determine whether a reasonable trier of fact could have found for the respondent. [Citation.]' [Citation.]" (*Ibid.*)

B.      *Analysis.*

As an initial matter, respondent argues that appellant forfeited his claim under *Kelsey S.* by not raising it in his motion for presumed father status in the juvenile court. We have reviewed the papers filed below and, although the issue was framed by appellant's counsel as a statutory one under Family Code section 7611, subdivision (d), counsel also cited constitutional cases including *Kelsey S.* and *In re Jerry P., supra,* 95 Cal.App.4th 793. The City Attorney's opposition brief discussed *In re Jerry P.* and whether appellant had promptly demonstrated a full commitment to a parental role. On this record, we find that the issue was sufficiently raised below so as not to have been forfeited.[8]

On the merits, appellant contends he established himself as a presumed father under *Kelsey S.* by taking prompt and reasonable steps to assume his parental responsibilities. According to appellant, he lived with the baby's mother during her

---

appellate courts to have considered the issue have had no difficulty extending its holding to dependency proceedings."

[8] Accordingly, we need not consider appellant's argument that, if he forfeited his claim to presumed father status under *Kelsey S.* in the juvenile court by failing to raise it, his counsel below provided ineffective assistance.

11

pregnancy, gathered items for the baby, and planned a move to be closer to a support system. He was present at the hospital when Alvin was born and visited him in the hospital over the next couple of days. During the dependency case, appellant requested and completed a paternity test. After the test results showed that he was Alvin's biological father, he filed a motion for presumed father status and attached a declaration explaining his efforts to prepare for Alvin's birth and his desire to raise his son. Appellant acknowledges that he was struggling with addiction and other problems, but contends that these are the type of parental faults the dependency courts and reunification services are designed to address and that they do not negate the efforts he made to establish himself as Alvin's presumed father.

We conclude the record supports the juvenile court's determination. Appellant's conduct after Alvin was detained supports the court's conclusion that appellant did not fully assume his parental responsibilities—emotional, financial, and otherwise. Appellant knew that Alvin was taken into protective custody and involved in a juvenile dependency matter, and he spoke on at least two occasions with the Agency's social worker at the hospital. Despite this, appellant did not attend the detention hearing, and did not contact the Agency's social worker at any time to inquire into Alvin's well-being, offer financial support, or indicate an interest in visiting or parenting Alvin. Appellant also did nothing to have his name placed on Alvin's birth certificate. (See *In re Sarah C*. (1992) 8 Cal.App.4th 964, 972-973 [denying *Kelsey S*. presumed father status in part because father never sought to be listed on the birth certificate and did not provide a home for the child].) From the time Alvin was detained shortly after his birth, the Agency heard nothing from appellant. It was not until appellant was located in jail in November, and counsel was appointed to represent him, that appellant sought involvement in the case. This does not constitute taking "prompt legal action" to assume parental responsibilities.

Moreover, appellant never indicated that he was willing to assume full legal and physical custody of Alvin. (See *In re Elijah V., supra,* 127 Cal.App.4th at p. 583

12

[denying *Kelsey S.* status where father never claimed he was willing to take full custody].) His motion and supporting papers make no mention of any intent to do so.

As for a third party preventing appellant from assuming full responsibility for Alvin, the record does not support appellant's claim that the Agency's interference prevented him from doing so. Appellant presented no evidence that he made any effort that was frustrated. He was absent from the detention hearing, out of touch with the Agency, and made no effort whatsoever to demonstrate a commitment to parenting Alvin prior to his being located in jail in November 2012.

Viewing the entire record, we see no abuse of the juvenile court's discretion in concluding that appellant did not " 'promptly take[]every available avenue to demonstrate that he [was] willing and able to enter into the fullest possible relationship' " with Alvin, within the meaning of *Kelsey S.* (1 Cal.4th at pp. 838-839.)

Appellant acknowledges that he did not appear in the dependency proceeding until November, but he raises several arguments that, under the circumstances, this delay does not undercut the commitment he demonstrated to parenting Alvin. First, he points out that "he could not voluntarily appear" after he was arrested on October 7, and so the duration of time in which he could have appeared was six weeks, i.e., from late August through the first week of October. We find this explanation entirely unpersuasive. Appellant was at all times aware of the dependency proceeding, yet there is no indication in the record that he ever attempted to contact the Agency or the court. There also is no indication that, while incarcerated, appellant could not make telephone calls.

Second, appellant argues the delay was not unreasonable and no case holds that "a short period of inaction destroys the commitment that a father demonstrated during pregnancy and child birth." Appellant relies on *In re M.C.*, *supra*, 195 Cal.App.4th at page 221, in which the court affirmed the finding that the biological father was a *Kelsey S.* presumed father. In particular, appellant cites to us the portion of the opinion in which, while acknowledging that the father arguably could have done more to demonstrate his full commitment to parent M.C., the court noted that "the law does not require [father] to do everything he possibly can." (195 Cal.App.4th at p. 221.) This is undoubtedly

13

correct, but *In re M.C.* is distinguishable on its facts. There, the various circumstances impacting the father's ability to assume parental responsibilities included "the financial, time and distance constraints of a new job in another state," the father's commitment to his pregnant fiancée in that state, in addition to the facts that the mother left the father during her pregnancy, the mother left the father without any information about how to reach her, and the mother's wife did not know the father or attempt to contact him or want him involved in her life with mother and the baby. (*Ibid*.) The *In re M.C.* court concluded that, under the circumstances, the juvenile court's finding that "[father] acted reasonably, promptly and consistently demonstrated his intention to make the fullest commitment as his circumstances permitted to fulfill his parental responsibilities" was supported by substantial evidence. (*Id*. at p. 222.) By contrast here, among other differences, appellant was living in the same geographical area as mother and Alvin, was present at Alvin's birth, and knew Alvin was involved in a dependency proceeding.

Third, appellant contends "the six-week period of [appellant's] absence was marred with several failures in notice," which should be considered in evaluating his conduct. First, the social worker and the court sent several notices to appellant at the Bayview neighborhood apartment rather than the address where appellant said he lived with mother. Second, the court and the Agency used an incorrect zip code, which appellant argues likely interfered with delivery. Finally, appellant complains that, despite conducting a "due diligence" search for mother, the Agency made no independent effort to locate him. Appellant clarifies that he is not claiming that notice was insufficient; rather, the notice issues are part of the circumstances of the case and are relevant to an evaluation of appellant's actions early in the proceedings.

We find none of these points persuasive, either individually or collectively. First, appellant does not controvert the social worker's statement that she telephoned appellant about the detention hearing and appellant indicated to her that he understood he needed to go to court.

Second, with respect to the Agency's and court's use of the Bayview neighborhood apartment address, it appears from the record that appellant provided that

14

address to the social worker. Appellant's point that the incorrect zip code for that street address was used by the court in mailing several notices is well taken.[9] However, other than the detention hearing, which appellant does not contend he was unaware of, no other hearings took place during the time the incorrect zip code was used; all proceedings were continued. Appellant does not argue that any prejudice resulted from the incorrect zip code.

Third, regarding efforts to locate the parents, the record contains a declaration of due diligence that the mother could not be located in advance of the hearing set for September 26, 2012. The record contains no indication that a similar search request was made to locate appellant at that time.[10] However, the September 26 hearing was continued to October 31, and then to November 28. On November 7, the Agency served notice of the November 28 hearing date on appellant at the San Bruno jail; his first appearance in this matter was shortly thereafter. Thus, no substantive hearings were held or decisions made in the proceeding while the searches for mother and appellant were ongoing. In any event, a biological father who seeks presumed father status bears the burden of promptly stepping forward and demonstrating his commitment to parental responsibilities. (See *In re Adoption of O.M., supra,* 169 Cal.App.4th at p. 679.) Appellant's failure to carry that burden is not mitigated by the Agency's failure to do more or find him sooner.

Finally, appellant suggests the juvenile court erred in inserting a "best-interests analysis" into the question of appellant's status. In ruling from the bench on appellant's motion, the juvenile court stated: "Well, in my view, in reviewing all the materials and listening to you today, remains focused on what is in the best interest of this child. [¶] And after looking at the various reports that have been filed and also taking into

[9] See appellant's Request for Judicial Notice, which was granted by this court by separate order filed on October 4, 2013.

[10] As we have stated, see *infra* section II., the record contains a search request for appellant and declaration of due diligence in advance of the March 29, 2013, jurisdiction and disposition hearing indicating that appellant was located in the San Francisco County jail on March 15, 2013.

consideration what the law says and what it takes to become a presumed parent, a father, I am of the view that at this point [appellant] has not accomplished that, and I am denying the motion." Appellant argues that, under *Kelsey S.*, the best-interest test does not govern the question of whether he is entitled to presumed father status; rather, requiring appellant to prove best interest in order to attain presumed father status, which would entitle him to services without a showing that the services were in Alvin's best interest, results in a circular analysis that defeats the constitutional protections afforded by presumed father status.

Appellant is correct that a best-interest showing is not required for presumed father status; rather, the child's best interest becomes a consideration in whether to order reunification services for a biological father who has not raised his status to presumed father. (§ 361.5, subd. (a).) However, even if the juvenile court erroneously considered Alvin's best interest in denying appellant presumed father status, and we are not concluding that it did, it is a fundamental principle of appellate review that "we review the lower court's ruling, not its reasoning; we may affirm that ruling if it was correct on any ground." (*In re Natasha A.* (1996) 42 Cal.App.4th 28, 38.) " 'There is perhaps no rule of review more firmly established than the principle that a ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason. If correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion.' [Citations.]" (*In re Zamer G.* (2007) 153 Cal.App.4th 1253, 1271.) The juvenile court's decision was supported by substantial evidence.

## IV.  DISPOSITION

The orders appealed from are affirmed.

_____
Haerle, Acting P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.