Filed 12/2/13  In re R.R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re R.R., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SAMUEL C.,<br><br>    Defendant and Appellant. | F066595<br><br>(Super. Ct. No. 516467)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Caitlin U. Christian, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, Carrie M. Stephens and Maria Elena Ratliff, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING OPINION**

After a Welfare and Institutions Code section 361.5[1] disposition hearing, the juvenile court found the minor, R.R., to be a dependent of the juvenile court and removed custody from Christy H. (mother)[2] and denied her reunification services. The court also found Samuel C. (father) to be the biological father and granted him reunification services. Father appeals from the court's order denying his request for determination as a presumed father and for placement, which he now contends was error. We disagree and affirm.

## FACTUAL AND PROCEDURAL HISTORY

R.R. was born in November of 2012, four weeks premature. Both she and mother tested positive for amphetamine. Mother had a prior child dependency case, in which she failed reunification services, including drug treatment. Mother's parental rights were terminated as to her older child.

Mother named father as R.R.'s possible father. According to mother, the two had a history of violence and he had stalked her. Although she had applied for a restraining order against him, she did not have the funds to follow through on the request.

A week before the November 27, 2012, detention hearing, the Stanislaus County Community Services Agency (agency) hand-delivered a letter to father, notifying him of the upcoming hearing and asking that he contact a social worker. When father called the social worker the day before the detention hearing, he asked about DNA testing to determine if he was R.R.'s father. He was advised that the court could order such testing.

That same day, the social worker called mother to remind her of the hearing. When asked if her address needed to be kept confidential because of her conflict with father, mother stated that he already knew her address. Mother was informed that father

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Mother is not a party to this appeal.

would be at the hearing the following day. Shortly thereafter, mother's partner, Jammie R., called and told the social worker that father had been very violent toward mother in the past and had strangled her.

The section 300 petition alleged mother's drug history, lack of preparation for the baby, and termination of her parental rights to her older child. The petition also noted father's violent behavior toward mother.

Prior to the November 27th detention hearing, father met with the social worker in the court hallway. She explained the court process to him and he filled out form JV-505 statement regarding parentage. On the JV-505 form, father checked the box requesting counsel and the box indicating "I do not know if I am the parent of the child and I … request blood or DNA testing to determine whether or not I am the biological parent." He did not check the box or complete the sections regarding actions that would make him a presumed parent.

Both mother and father were present for the detention hearing and counsel was appointed for each. R.R. was detained in a foster home and the matter was continued until the beginning of January of 2013 for paternity results, jurisdiction and disposition.

At the end of December 2012, an amended petition was filed, adding a second alleged father, Steve G. It also alleged that father attempted to strangle mother on one occasion and that he had followed her. Also added were allegations that father had a criminal history of domestic violence, several convictions, and various arrests for possession of controlled substances.

*Jurisdiction/Disposition Hearings*

The report prepared on January 2, 2013, in anticipation of the jurisdiction/disposition hearing, stated that paternity test results were still pending for father. Steve G. had been contacted by the agency, but had not responded. The report recommended that both alleged fathers be denied services. The agency recommended reunification services for mother, but also noted that both mother and her partner Jammie

3.

had tested positive for methamphetamine and other illegal drugs after a visit on December 14, 2012.

The report included father's lengthy criminal history, including his most recent arrest as occurring in May of 2010, for assault with a deadly weapon, not a firearm, with great bodily injury likely, as well as a violation of probation. Father was given referrals for services and asked to drug test, but had not begun services nor had he drug tested when asked to do so.

At the January 7, 2013, jurisdiction/disposition hearing, father was present, but mother was not. Through paternity testing, father was found to be the biological father of R.R. His counsel asked that his status be elevated to that of presumed father and that he be granted visitation. Counsel for the agency objected, stating that while father might be the biological father, he had not shown any other factors necessary to be raised to presumed status at that point. The juvenile court found father to be the biological father and ordered visitation. It struck Steve G. from the petition.

The agency notified the court that it was going to change its recommendation to deny services to mother. A contested jurisdiction/disposition hearing was set for January 25, 2013.

An addendum report prepared in anticipation of the contested hearing recommended that father be granted services and mother be denied services. Father was given an updated referral for services. He had begun the intake process at Sierra Vista and had visited R.R. twice since the previous hearing.

Mother failed to appear at the contested jurisdiction/disposition hearing on January 25. A continuance on her behalf was denied.

Father testified on his own behalf that he was 45 years old and had been in a relationship with mother, on and off, for close to a year. The relationship ended when she was five months pregnant with R.R. Father participated in mother's pregnancy "as much as [mother] would allow." He attempted to get her to go to the doctor and he

4.

listened to the baby's heartbeat with a monitor. Father denied any domestic violence between the two of them and denied stalking her. He did acknowledge going to her place to see if he could get her to go to the doctor and that he had knocked on the door so long, the neighbor's were mad at him. He was aware that she was using drugs during her pregnancy and he tried to get her to stop.

Father found out through mutual friends that mother did not receive prenatal care until she was six months pregnant. Father had not been to an appointment with mother; while he went to the scheduled appointments, she did not show up. Father had gone to mother's parents' house and tried to get her to answer the door and also tried calling her to attempt to get her to go to the appointments.

Father testified that he started setting up a nursery for R.R. "a long time ago," before he and mother split up. He finished it four days before the hearing when he painted a dresser for the baby. He purchased prenatal vitamins for mother once prior to their breakup. He did not offer to pay for items after they broke up because he was not able to talk to her.

Father asked for DNA testing because of what people were saying about Steve G. After the test results, he began to engage in the referrals, but had not yet had an alcohol or drug assessment.

Father bought a crib for R.R. before her birth. He lived with his own mother and, during his and mother's relationship, mother stayed with him from time to time. After the relationship ended, he did not speak to mother. She was staying with her parents who lived behind father's mother's house. Father saw mother four or five times between the time they broke up and when R.R. was born

Father completed a domestic violence class 18 years ago. According to his CLETS report, domestic violence allegations occurred between 1998 and 2005, and he had not had counseling for domestic violence since the earlier class. Father had not had substance abuse treatment, but did not believe he had a problem with substance abuse.

5.

Neither did he think he had a problem with domestic violence. He had attended one group parenting session so far.

Although his CLETS report stated father was charged with battery on a spouse in 2008, he did not remember the incident. He did not believe there was any domestic violence between him and mother, but acknowledged he had had "two or three" other relationships that had involved domestic violence.

Father testified that mother's drug use while pregnant made him angry. He had verbal arguments with her about it. One such argument, just before she left, turned physical. At that point, they thought mother was pregnant but still had not been to the doctor to confirm it. When asked how he listened to the baby's heartbeat when he had never been to a prenatal appointment with mother, father replied that they had "a little monitor." When the juvenile court asked how he was able to listen to the baby's heartbeat if the two of them weren't sure mother was pregnant, father replied, "Well, that's what I thought was the baby's heartbeat."

Father testified that he remembered speaking to a social worker and asking for a DNA test and that, if the baby was his, he "wouldn't mind jumping through anything they would ask." But he was only willing to do a drug test if the DNA test confirmed the child was his.

When asked by the juvenile court why he would buy a crib and other items if he did not know the child was his, father stated that he purchased the items before he "heard about Steve G." He purchased a few other things after he heard about Steve G., "just in case." After father got the DNA results in early January of 2013, he decided to follow up with Sierra Vista and sign up for parenting classes.

When asked if his three convictions for domestic violence in 1989, 1991 and 1995 were for three different women, father stated he thought they involved two different women. When asked what his felony false imprisonment conviction was about, he stated he had "[n]o idea."

6.

With regard to an argument with mother that had escalated to violence, father stated that mother was upset, he tried to kiss her and she bit his tongue. At that point, the relationship ended and she went to her mother's house.

Father stated that, if R.R. was placed with him, a babysitter or his mother would help care for her. But he acknowledged that his mother is disabled and in a wheelchair because she is overweight and has no cartilage in her knees. According to father, he bought the baby stuff, "[j]ust in case she was mine."

When asked by the juvenile court why he would not also submit to a drug test "just in case she was [his]," father explained that it was because it was after he heard about Steve G. Father learned of Steve G. about a month after mother left, and he was annoyed that she might have cheated on him "[o]n a couple of occasions." Although he had been concerned that R.R. was not his biological child, he wanted to provide for her now "[b]ecause she's mine."

Father had attended AA/NA in the past, but claimed to be clean since he stopped going sometime around 2010. He stated his drug of choice was alcohol, although he had tried methamphetamine. When he stopped attending AA, he stopped altogether, without a sponsor.

At the conclusion of father's testimony, the agency argued that it was not in R.R.'s best interest to be released to him. While he had made some efforts to assist mother while she was pregnant, he curtailed those efforts when he heard she might have had a relationship with Steve G. The agency had serious concerns regarding allegations of domestic violence in his relationship with mother, and his lengthy history of domestic violence. Further, he was unwilling to engage in services until he was found to be the biological father through DNA testing.

Counsel for R.R. concurred that father should be given reunification services, but not placement at this time. Counsel was very concerned about father's extensive domestic violence history, and the fact that he could not remember a conviction for false imprisonment, which resulted in jail time. It was recommended that father needed an assessment and anger management treatment before being considered for placement.

Counsel for father requested he be elevated to presumed father status, arguing that, even after finding out about Steve G., he still made "some" efforts in case R.R. turned out to be his daughter. Counsel argued that the agency, in requesting that father not be given placement services, "has to prove a substantial risk of detriment to R[.] on today's date or that it is not in her best interests on today's date," and claimed it failed to do so. Counsel went on to ask that mother's statements about domestic violence be viewed as hearsay, as it was not supported by other evidence.

In rebuttal, agency's counsel stated that father did not qualify for presumed father status as he had never taken the child into his home, no argument had been made by father's counsel that he be considered a presumed father pursuant to *Kelsey S.*,[3] and he did not show a full commitment to R.R. because he wanted DNA proof before he would submit to an assessment.

*Juvenile Court's Findings*

The juvenile court found by a preponderance of the evidence that the petition was true. It denied services to mother. It found evidence to substantiate the allegation of domestic violence by father based on mother's statement and the corroboration of mother's partner. The juvenile court did not find father's testimony completely credible, stating that it was "confused how one holds oneself out as the father of a child, but yet refuses to do everything, including a request for a drug test. And when you file a paper saying 'I don't know if I'm the father until I have a DNA test,' how is that holding

[3] Referring to *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).

8.

oneself out to the community to be the father?" The juvenile court found father to be the biological father, not the presumed father. The juvenile court then found, by clear and convincing evidence, that there is or would be a substantial danger to R.R.'s well-being if she were returned to either parent at this time. Reunification services were ordered for father.

## DISCUSSION

I. THE JUVENILE COURT DID NOT ERR IN DENYING FATHER PRESUMED OR *KELSEY S.* FATHER STATUS.

Father contends that, because he was prevented from obtaining presumed father status under the Family Code, his request for presumed father status below was actually a request to be recognized as a *Kelsey S.* father, and the juvenile court erred in failing to grant him such status. We disagree.

Only a presumed father enjoys the panoply of rights set forth by the dependency statutes and a father who is an alleged or a biological father is entitled to fewer rights. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449.) The Family Code sets forth the criteria for determining presumed father status, which include: a man marries or attempts to marry the child's mother, he and the mother execute a voluntary declaration of paternity, or he receives the child into his home and openly holds out the child as his natural child. (Fam. Code, §§ 7571, 7573, 7611, subds. (a)-(d).) A biological father is one whose paternity of the child has been established, but who has not established that he qualifies as the child's presumed father. (*In re Zacharia D., supra,* at p. 449, fn. 15.) An alleged father is a man who may be the father of the child but who has not established biological paternity or presumed father status. (*Ibid.*)

In dependency proceedings, a man's status as a presumed father is critical. (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1410.) "[P]resumed fathers possess far greater rights than alleged or biological fathers. [Citation.] Only a presumed, not a mere biological, father is a 'parent' entitled to receive reunifications services, and only a presumed father

9.

is entitled to custody of his child. [Citation.] In contrast, the juvenile court 'may' order reunification services for a biological father if the court determines that the services will benefit the child." (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596; see also *In re A.A.* (2003) 114 Cal.App.4th 771, 779-780.)

Here, a paternity test established that father was the biological father. But, "'the mere existence of a biological link does not merit … constitutional protection' [citation]; rather, the federal Constitution protects only the parental *relationship* that the unwed father has actively developed by '"com[ing] forward to participate in the rearing of his child"' [citation] and 'act[ing] as a father.'" (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1052.) "'Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.'" (*Lehr v. Robertson* (1983) 463 U.S. 248, 260, italics omitted.)

Sometimes, the mother or another third party prevents the purported father from satisfying the factual predicates needed for "presumed father" status, such as here where mother's conduct and R.R.'s detention just days after her birth barred him from physically receiving the child into the home. (*Kelsey S., supra,* 1 Cal.4th at p. 825.) "[A]n unwed biological father who comes forward at the first opportunity to assert his parental rights after learning of his child's existence, but has been prevented from becoming a statutorily presumed father under [Family Code] section 7611 by the unilateral conduct of the child's mother or a third party's interference" acquires a status "equivalent to presumed parent status under [Family Code] section 7611." (*In re M.C.* (2011) 195 Cal.App.4th 197, 213, 220.) Thus, an unwed man may have a constitutional right to presumed father status if he "promptly comes forward and demonstrates a full commitment to his parental responsibilities -- emotional, financial, and otherwise …." (*Kelsey S., supra,* 1 Cal.4th at p. 849.) Such a father is referred to as a "*Kelsey S.*" father.

In determining whether a father is a *Kelsey S.* father, the court must consider the father's conduct "both *before and after* the child's birth …." (*Ibid.*) "Once the father

10.

knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness to assume full custody of the child ….'" (*Ibid.*) A court should also consider the father's public acknowledgement of paternity, payments to pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child. (*Ibid.*)

Father, who concededly does not qualify for presumed father status under Family Code section 7611, seeks to assert his status as a *Kelsey S.* father. The agency argues father waived his right to complain that the juvenile court did not find he had *Kelsey S.* father status because he did not make a request to be so declared at the dispositional hearing. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 582.) Even assuming father did not waive his right to argue he was entitled to be declared a *Kelsey S.* father, he fails to satisfy the *Kelsey S.* threshold requirement of promptly coming forward and demonstrating a full commitment to his parental responsibilities.

Obviously, determination under *Kelsey S.* is fact specific. "[O]ur task, '"begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted"' to support the trial court's ruling. [Citation.] That ruling is presumed correct, and 'all intendments and presumptions are indulged in favor of its correctness.' [Citation.] In other words, the evidence must be viewed in the light most favorable to the prevailing party. [Citations.]" (*Adoption of Michael H., supra,* 10 Cal.4th at p. 1064 (conc. & dis. opn. of Kennard, J.).)

We find the record supports the juvenile court's finding that father was not a presumed father under *Kelsey S.* Father's statement regarding parentage contained in form JV-505, in which he requested DNA testing, but did not request that he be found the presumed father; his initial inaction upon being given services; and his testimony at the disposition hearing contained contradictory descriptions about his claim of parentage and

11.

what he did for mother and R.R.  It was therefore up to the juvenile court to determine what to believe.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

Father knew of R.R.'s existence before she was born, made some effort to assist mother by buying vitamins for her, tried to get her to go to prenatal visits and bought a baby crib and a few other items, but he discontinued his support and commitment about the sixth month of pregnancy because he "heard" there was another possible father.  After that, he bought a few things, "just in case," but otherwise refused to begin services provided until he was proven to be the biological father.

We are not persuaded by father's efforts to compare himself favorably to the man, J.R., who prevailed on his claim of presumed or *Kelsey S.* status in *In re Jerry P.* (2002) 95 Cal.App.4th 793 (*Jerry P.*).  In *Jerry P.*, J.R. had a relationship for approximately a year with the child's mother during which time the baby Jerry was conceived.  When J.R. learned the mother was pregnant, he assumed the baby was his and told others the mother was pregnant with his child.  J.R. eventually broke off his relationship with the mother due to her drug abuse despite his warnings she was harming the baby.  Notwithstanding their breakup, J.R. continued to provide support for the mother, by supplying her with vitamin supplements and bus fare for doctor visits, helping with prenatal care and paying for medications.  (*Jerry P., supra,* at p. 797.)  Then after Jerry was born, J.R. visited him frequently in the hospital until one day when the baby was gone.  Unaware Jerry had been placed in foster care and dependency proceedings initiated after the baby's mother tested positive for cocaine, J.R. tried unsuccessfully for four months to find Jerry.  When J.R. eventually learned of Jerry's whereabouts, he requested visits without success.  He then went to court and petitioned for presumed father status and secured visitation rights, which he vigorously exercised.  J.R. was open "'to any services that would help,'" even though subsequent DNA tests showed he was not Jerry's biological father.  (*Id.* at pp. 798-800.)  The appellate court held that *Kelsey S.* protection should extend to men such as J.R. who have demonstrated their commitment to parental responsibilities by meeting

12.

the conditions set forth in *Kelsey S.*, "none of which depend on biology." (*Jerry P.,*
*supra,* at p. 816.)

In contrast, for father here, everything depended on biology. He curtailed his
support for mother and preparations for the baby when he heard that there was a
possibility that he was not the father. But although he lived right behind the home
mother was living in with her parents, and he, by his own acknowledgement, saw mother
4 or 5 times between when they broke up and when she gave birth, he never requested of
her or through anyone else that he wished to have paternity testing done to determine if
the child was his. It was not until he was first asked to contact the agency after the
child's birth that he, after waiting another five days, then asked for a DNA test. While
waiting for results, father declined to drug test in preparation for parenting services.

In *In re D.A.* (2012) 204 Cal.App.4th 811, on which father relies, the father and
mother had a nonexclusive relationship when she got pregnant. Mother informed father
that he might be the father. Father expressed his desire for a genetic test to determine if
he was the baby's father, he took mother to two doctor visits, and offered to help with
any associated expenses. Soon after, mother cut off contact with father, and he did not
again learn her whereabouts until after the child was born. He then again requested a
paternity test, but mother stalled, and none was performed before the child was detained
due to mother's behavioral issues. After testing determined that another man the court
originally found to be the presumed father was not the biological father, father attended
the very next hearing and informed the court that, if he was the biological father, he
wanted to form a relationship with the child. The genetic test results showed he was the
biological father, and he requested presumed father status and visitation. He attended
every hearing after that and had consistently requested visitation. (*Id.* at pp. 824-825.)
The appellate court held that father had demonstrated *Kelsey S.* father status when
"[d]uring [the] mother's pregnancy he expressed his desire for a genetic test to determine
whether he was the baby's father, he took [the] mother to prenatal medical appointments,

13.

and he offered to help with any associated expenses.  His involvement ended only because mother cut off contact with him … and he had no other way of reaching her." (*In re D.A., supra,* at p. 824.)

On appeal, the previously named presumed father faulted father for having asserted, before he was determined to be the child's biological father, that he wished to be a father to the child *if the child was his*.  But as stated by the appellate court, the previously named presumed father "cites no authority for the proposition that a *Kelsey S.* father must unconditionally assert his parental rights even before knowing whether the minor is his biological child, and we are aware of none.  Rather, the law requires that '[o]nce the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit.' [Citation.]"  (*In re D.A., supra,* 204 Cal.App.4th at p. 825.)

We agree with *In re D.A., supra,* 204 Cal.App.4th at page 825, that there is "no authority for the proposition that a *Kelsey S.* father must unconditionally assert his parental rights even before knowing whether the minor is his biological child," and we do not mean to imply or suggest that a father forfeits presumed father status by requesting DNA testing.  But a father must still promptly "attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit" (*Kelsey S., supra,* 1 Cal.4th at p. 849).  Father's inconsistent actions over the months both before and after R.R. was born, including the fact that he never expressed a desire for paternity testing before the child's birth, runs counter to the full parental commitment envisioned in *Kelsey S.*

Here, in contrast to J.R. in *Jerry P.*, father did not meet the requirements of *Kelsey S.*, as outlined in *Jerry P.*:

> "[A] man is entitled to protection from invidious discrimination in attempting to attain presumed father status if (1) once he 'knows or reasonably should know of the pregnancy, he …promptly attempt[s] to

14.

assume his parental responsibilities as fully as the mother will allow and his circumstances permit,' and (2) 'is indisputably ready, willing, and able to exercise the full measure of his parental responsibilities …. [¶] … [¶] … emotional, financial, and otherwise.'" (*Jerry P., supra,* 95 Cal.App.4th at pp. 816-817, fns. omitted, quoting *Kelsey S., supra,* 1 Cal.4th at pp. 847, 849.)

We agree with the juvenile court that father does not meet these requirements.

In any event, even if the court erred in this finding, it was necessarily harmless. "'Presumed father status entitles the father to appointed counsel, custody (absent a finding of detriment), and a reunification plan. [Citations.]'" (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.) Here, father had appointed counsel and he was offered reunification services. And, as discussed below, while he was denied custody, it was due to a finding of detriment, not his lack of status as a presumed father.

## II. THE JUVENILE COURT DID NOT ERR WHEN IT DENIED FATHER'S REQUEST FOR PLACEMENT UNDER SECTION 361.2

Father contends that, as a noncustodial presumed father, the juvenile court should have analyzed placement of R.R. under section 361.2. We disagree.

Section 361.2, subdivision (a) provides that "[w]hen a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." However, only a presumed father is entitled to custody under section 361.2. (*In re Zacharia D., supra,* 6 Cal.4th at p. 451.) And, as discussed in section I, *ante*, because the juvenile court found

15.

that father was not R.R.'s presumed father, he is not entitled to custody under section 361.2.[4]

In any event, even though the juvenile court did not find father to be a presumed father, it exercised its discretion to offer father reunification services. (§ 361.5, subd. (a) [biological father may receive reunifications services if he signs declaration of paternity and the juvenile court determines services would benefit child].) It also made a finding by clear and convincing evidence that placement of R.R. in the custody of either mother or father at this point would create "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if she were to be returned to the custody of either parent at this time, and there [were] no reasonable means by which she can be protected without removal from her parents' physical custody." So, even though not required to, the juvenile court made findings as if section 361.2 applied.

In making its determination, the juvenile court noted allegations of domestic violence and stalking behavior on father's part and his criminal history, which involved violence and drug involvement. These two sustained allegations of the petition that pertained to father, while unnecessary for the court to assume jurisdiction over R.R., are nonetheless relevant for purposes of disposition. (*In re Jeffrey P.* (1990) 218 Cal.App.3d 1548, 1553-1554.) In addition, at the time of disposition, R.R. was two months old, born prematurely, and tested positive for methamphetamine. Father had participated in services for only two and a half weeks; he had attended one parenting class group session and visited R.R. twice. Substantial evidence supports the juvenile court's finding denying immediate placement of R.R. with father.

---

**4** We decline father's request that this court "find section 361.2 applies irrespective of a parent's status as 'offending' or 'nonoffending' to ensure he is not erroneously precluded from consideration under section 361.2 and to prevent the disparate treatment of noncustodial parents in this district."

## DISPOSITION

The orders appealed from are affirmed.

                                    _____

                                          Franson, J.

I CONCUR:


_____

Peña, J.

17.

**Poochigian, J., Concurring.**

I concur in the majority's disposition of this case. However, I write to underscore that father's concern over whether he was the biological father should not weigh against him under the rationale of *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).

The majority holds "the record supports the juvenile court's finding" that father was not a *Kelsey S.* father. (Maj opn. at p. 11.) The first piece of evidence offered in support of this conclusion is father's parentage form JV-505. (*Ibid.*) The majority notes that on that form, father "requested DNA testing, but did not request that he be found the presumed father;…" (*Ibid.*) However, not requesting to be found a presumed father is entirely consistent with being a "quasi-presumed" or *Kelsey S.* father. Indeed, one defining attribute of *Kelsey S.* status is that the father "has been *prevented from becoming* a statutorily presumed father …." (*In re M.C.* (2011) 195 Cal.App.4th 197, 213, italics added.)

The majority states that "for father here, everything depended on biology." (Maj. opn. at p. 13.) But, I find it consistent (and reasonable) to be willing to parent one's own biological children while expressing reluctance to assume parental responsibilities for the biological children of others. I am concerned the majority's opinion could be misinterpreted as reproving father for caring whether the child was biologically his. Like the Second District, I am aware of no authority for the proposition "that a *Kelsey S.* father must unconditionally assert his parental rights even before knowing whether the minor is his biological child …." (*In re D.A.* (2012) 204 Cal.App.4th 811, 825.)

Instead, I would affirm on the simple basis that any error on this issue was harmless. As the majority notes, father effectively received the benefits of presumed father status: appointed counsel, the right to custody if there is no finding of detriment, and a reunification plan. (Maj. opn. at p. 15.) Therefore, I concur in the affirmance of the juvenile court's order.

_____
Poochigian, Acting P.J.