Filed 11/23/20  In re G.P. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re G.P. et al., Persons Coming Under the Juvenile Court Law. | B304590 (Los Angeles County Super. Ct. No. 19CCJP06143) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JUSTIN B.,<br><br>Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed in part and reversed in part.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] Justin B. (Father) appeals from the disposition orders, challenging (1) the denial of his request for presumed parent status as to the half sibling of his two biological children; (2) the jurisdictional finding against him and related components of his case plan; (3) the order suitably placing the three children in foster care rather than with him; and (4) the order restricting him to supervised visitation with his biological children. For the reasons explained below, we reverse the jurisdictional finding against Father and a related component of his case plan. In all other respects, we affirm the disposition orders.

## BACKGROUND

### I.     Non-Detain Dependency Petition

On September 20, 2019, the Los Angeles County Department of Children and Family Services (DCFS) filed a non-detain petition against Glenda P. (Mother)[2] under section 300,

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2] Mother is not a party to this appeal. Accordingly, we do not summarize all the facts set forth in DCFS's reports supporting the jurisdictional findings against Mother and the disposition orders as to Mother (removal of the children), which are not challenged in this appeal.

subdivisions (a) and (b), alleging her three children, G.P. (a girl nearly 10 years of age), N.P. (a girl nearly eight years of age), and D.P. (a boy nearly seven years of age), were at risk of harm due to Mother's history of domestic violence with her boyfriend (not Father).[3] The petition alleged that during a recent incident, Mother's boyfriend struck and choked Mother and pushed G.P. and N.P. when they tried to intervene in the altercation. The petition also alleged that Mother allowed her boyfriend to have unlimited access to the children.

As set forth in a September 23, 2019 Detention Report, at the time DCFS filed the petition, Mother and the three children were homeless and living in a tent. Although DCFS determined juvenile court intervention was necessary to protect the children, DCFS decided not to detain the children from Mother at the time it filed the petition because the children consistently attended school and Mother appeared to be meeting their basic needs.

In interviews leading up to the filing of the petition, Mother informed the social worker that she had been in a relationship with her boyfriend (who she represented was now her ex-boyfriend) on and off for about six years. He was not the father of any of the children. She indicated that G.P., N.P., and D.P. did not all have the same father. She denied she had contact information for the fathers, stating "the fathers have not been in the children's lives since they were born."

At a September 3, 2019 detention hearing on the petition, Mother identified G.P.'s biological father as "James" (last name

---

[3] Throughout this opinion, "the children" refers only to G.P., N.P., and D.P. Mother's parental rights to another child were terminated, and the child was adopted in or around 2011.

unknown), and N.P. and D.P.'s biological father as Father (appellant Justin B.). On parentage questionnaires that Mother filled out for each of the three children and submitted to the juvenile court on the date of the detention hearing, Mother indicated that neither man was present for the birth of his child(ren) or signed a birth certificate. She did not provide contact information for either man, but she listed a city of residence for Father on the parentage questionnaires for N.P. and D.P. and stated that Father "is on Facebook." Neither man appeared at the detention hearing. The juvenile court found James to be the alleged father of G.P. and Father to be the alleged father of N.P. and D.P. The court found DCFS made a prima facie showing that the children were persons described by section 300 and detained the children from the alleged fathers and ordered the children to remain released to Mother. The court ordered monitored visitation between the children and their respective alleged fathers, once the alleged fathers contacted DCFS, and no contact between the children and Mother's boyfriend.

## II. DCFS Detains the Children From Mother

On or about October 23, 2019, DCFS detained the children from Mother and placed the girls, G.P. and N.P., in one foster home, and the boy, D.P., in another foster home. The same day, DCFS filed an ex parte application under section 385, requesting the juvenile court modify the order releasing the children to Mother and order the children placed in shelter care. DCFS reported in the application that Mother had allowed the children to have contact with her boyfriend, in violation of the juvenile court's September 23, 2019 order, and she refused domestic violence and parenting services.

4

In an October 24, 2019 Detention Report on the ex parte application, DCFS stated that neither Father nor James had been in contact with DCFS. At an October 25, 2019 detention hearing, the juvenile court ordered the children detained in shelter care, with monitored visitation for Mother.

## III. Father Appears in Court on the Date Originally Scheduled for the Adjudication/Disposition Hearing

At the time DCFS prepared its November 15, 2019 Jurisdiction/Disposition Report, the whereabouts of Father and James were unknown. As stated in the report, Mother informed DCFS that she was in a relationship with James for two years and with Father for nine years (dates not specified). DCFS recommended reunification services for Mother but not for Father and James, as they were alleged Fathers only. DCFS conducted a due diligence search for both alleged fathers and sent notices of the November 15, 2019 adjudication/disposition hearing to Father at various addresses it found.[4]

On November 15, 2019, Father made his first appearance in these proceedings, at what was scheduled to be the adjudication/disposition hearing. On that date, he filled out and submitted to the juvenile court a Statement Regarding Parentage (form JV-505) for each of the three children. On the form for G.P., Father acknowledged G.P. was not his biological daughter. He requested that the juvenile court find him to be G.P.'s presumed parent, indicating on the form (1) G.P. lived with him from her birth in late 2009 until sometime in 2014; (2) he told

---

[4] Without a last name for James, DCFS was unable to locate a potential address for him. James never participated in these dependency proceedings.

5

family members and friends that G.P. was his child; (3) he took G.P. to public parks, daycare/school, stores, movies and restaurants, and participated in movie nights and other family activities with her; (4) he provided financial support, shelter, food, clothes, and other necessities to G.P.; (5) G.P. spent time with the "paternal grandfather" (presumably Father's father); and (6) Father took care of G.P. as if she was his biological child. Father did not indicate on the form whether his relationship with G.P. continued after 2014, the year he listed on the form as the date G.P. stopped living with him.

At the November 15, 2019 hearing, the juvenile court found Father to be the presumed father of N.P. and D.P. but not G.P. The court reiterated that James, who was not present in court, was G.P.'s alleged father. Upon Father's request, the court ordered DCFS to provide housing and transportation assistance for Father. The court also ordered monitored visitation for Father with N.P. and D.P. The court continued the adjudication/disposition hearing to December 12, 2019.

## IV.  After Interviewing Father, DCFS Files a First Amended Dependency Petition

As set forth in a December 12, 2019 Last Minute Information for the Court, DCFS interviewed Father on November 25, 2019. According to the report, Father stated during the interview that he and Mother were in a relationship for three years (dates not specified).[5] He represented "he was

---

[5] As set forth above, Father indicated on the Statement Regarding Parentage form that he lived with Mother's daughter G.P. (and presumably Mother) from G.P.'s birth in late 2009 until sometime in 2014, a period of four to five years. Mother told DCFS that she and Father were in a relationship for nine years.

6

present for the birth of all three children and that he is the biological father of all three children" (notwithstanding that Father acknowledged he is not G.P.'s biological father on the Statement Regarding Parentage form he filled out and submitted to the juvenile court 10 days before this interview). Father also stated Mother did not allow him to sign the children's birth certificates.

Father further stated that during his relationship with Mother, she "kept leaving him for her current boyfriend." Father heard about domestic violence occurring between Mother and her boyfriend when Mother and the children lived outside of California with Mother's boyfriend (during a period not specified). Father advised Mother to obtain a restraining order against her boyfriend. According to Father, Mother and the children last stayed with Father "approximately towards the end of 2018," and then Mother "left him [Father] once again for this boyfriend." Father stated he "last saw his children seven months ago and that he did not know where Mother was." Father supported DCFS's decision to detain the children from Mother.

Father also informed DCFS during the November 25, 2019 interview that his family had a history of bipolar disorder, schizophrenia, and depression. Father stated he was diagnosed with bipolar disorder on a date not specified in the report. He further stated he had "never had any psychiatric hospitalizations," was not currently enrolled in mental health services, and was " 'very stable.' " Father explained he "prefer[red] to smoke marijuana over taking psychotropic medication because the medication makes him drowsy and causes stomach issues." He stated he smoked marijuana "once in the morning and once after work each day and this help[ed] him

7

regulate his mood." He "began smoking marijuana and drinking alcohol as a teenager and ha[d] never experimented with any other kind of drug." He reported he currently only drank alcohol a few times per year, on special occasions.

Father further stated he wanted to "work towards having full custody of the children," but first he "need[ed] help with obtaining housing." He explained he was "currently staying with a friend, but this is not a good friend and that he [did] not want his children to be released to him at this home." Father reported he had employment at a restaurant where he worked "almost full time as a dish washer and food preparer," but he wanted to obtain employment as a chef. He also occasionally had "side jobs and auditions" for his avocation as a rap artist.

On December 11, 2019, DCFS filed a first amended dependency petition, which included the same allegations under section 300, subdivisions (a) and (b) regarding Mother's history of domestic violence with her boyfriend, and added an allegation under section 300, subdivision (b) regarding Father's untreated mental and emotional issues, bipolar disorder diagnosis, and failure to seek mental health services or take psychotropic medication "as prescribed."

On December 12, 2019, Mother and Father appeared at what was scheduled for a continued adjudication/disposition hearing, and they each denied the allegations in the first amended petition. Father's appointed counsel informed the juvenile court that "Father would like to renew his earlier application to be found presumed [father] for [G.P.]," explaining, "It's Father's position he's cared for the child as if [she] were his

own." Appointed counsel for G.P. and N.P.[6] objected to the request, but before counsel could state the reason for her objection, the juvenile court responded, "I'm just considering it. I haven't read the report." The court continued the adjudication/disposition hearing to January 29, 2020.

## V.    Adjudication/Disposition Hearing

Mother and Father appeared at the January 29, 2020 adjudication/disposition hearing. After the juvenile court admitted DCFS's reports (and some exhibits offered by Mother) into evidence, Father testified on his own behalf regarding the allegations against him in the first amended petition (count b-2), his request for custody of the children, and his request for presumed father status as to G.P.

Father stated he was diagnosed with bipolar disorder when he was 12 years old.[7] He was prescribed Depakote and another medication he could not recall for his condition. He stopped taking the medications when he was 16 or 17 years old because he felt "physically well" and "stable." His mental health provider did not tell him "it was okay" to stop taking the medications, but the provider was aware he had stopped taking the medications. The last time he saw a mental health professional he was 23 years old (around seven years before his testimony at this adjudication/disposition hearing). At that time, his mental health provider informed him he no longer suffered from bipolar disorder, only depression. The provider did not tell Father he no

_____

[6] The juvenile court appointed separate counsel for D.P. after DCFS placed him in a different foster home than his sisters.

[7] Father was 30 years old when he testified at the January 29, 2020 adjudication hearing.

9

longer needed mental health services, but Father chose to end the services because he felt he was "functional" and could take care of himself.

Father denied he used marijuana to treat bipolar disorder, characterizing DCFS's statement in its report as "a misunderstanding." He testified he used marijuana "for back pain, knee pain, joints, bones, arthritis." He stated he did not use marijuana in the children's presence, and he stored his marijuana in a "locked and sealed" and "smell proof" case. Father testified he currently smoked marijuana "[e]very once in a while," and no longer on a daily basis, because he could not "financially afford it."

Father testified he did not currently have depression or any other mental health disorder, and he was "able to function" and to work. He had been employed at his current job at the restaurant for the past three years, and before that he worked at a warehouse for five or six years. He currently worked on Saturday and Sunday mornings, and three days during the week from 4:30 to 9:00 p.m. He stated he "ha[d] been speaking with [a woman] about paying her to do [his] child care" if the juvenile court placed the children in his custody. Father acknowledged he had not discussed his child care plan with DCFS.

Father stated he moved into a new apartment on December 24, 2019, about a month before the adjudication/disposition hearing. He lived with three other (unidentified) people. He had not invited DCFS to inspect the apartment. He testified that DCFS contacted him about visits with his children, but not about inspecting the apartment. He acknowledged, however, that he had only returned one of the "few phone calls" DCFS had made to him. He had not yet provided his new address to DCFS or the

10

juvenile court. He acknowledged the telephone number DCFS had for him was not current because his phone was stolen a few days before and he had not yet given his new telephone number to DCFS.

When Father's counsel asked him, "have the children ever been under your care," Father responded, "[o]nly on visitation levels." Father stated the children last stayed overnight with him "a few years" before the January 29, 2020 adjudication/disposition hearing. Father's counsel asked if "there [were] any problems taking care of the children," and Father responded: "No, not really. [¶] Just -- I work a lot, so I also had to try to get weekends."

Father testified that he called G.P. his daughter even though she was not his biological child. He stated he "raised" and "trained" her and spent half her life with her. He explained that he "came into her life [when] she was three months" old. When G.P.'s counsel asked Father to state G.P.'s birthday, Father responded, "I do not know her birthday." He listed two dates that were in the same month as, and close to, her birthday. Father testified that for a period of time G.P. attended his overnight visits with N.P. and D.P., but at some point she stopped attending because "[s]he was always with her[] so called biological father, or she was with her auntie."

After Father's testimony, the juvenile court heard argument by the parties. Counsel for D.P., counsel for G.P. and N.P., and counsel for DCFS urged the juvenile court to sustain all allegations in the petition, remove the children from Mother, and order the children to remain suitably placed in shelter care, arguing that placement with Father would be detrimental to the children. Counsel for G.P. and N.P. also asked the court to reject

11

Father's request for presumed father status as to G.P., informing the court that G.P. "vehemently object[ed] to [Father] being her presumed father," and arguing the evidence does not support Father's request.

Mother's counsel asked the juvenile court to dismiss the allegations pleaded against her, sustain the allegations pleaded against Father, place the children with her, and deny Father's request for presumed father status as to G.P.

Father's counsel argued the juvenile court should find Father to be a nonoffending parent and place the children with him because there is insufficient evidence to sustain the allegations in the petition that Father currently suffers from bipolar disorder and, even if he does, that the mental health condition places the children at risk of harm. Father's counsel urged the court to place the children with him even if the court sustained the allegations against him or, at a minimum, grant him unmonitored visitation. Father reiterated his request that the court find him to be G.P.'s presumed father. Father's counsel stated Father would submit to a case plan consisting of random, on demand drug tests, parenting, and individual counseling, but he objected to DCFS's recommendation that he submit to a psychological assessment, based on the insufficiency of the evidence supporting that recommendation.

The juvenile court sustained the allegations in the petition regarding Mother's history of domestic violence with her boyfriend (counts a-1 & b-1). The court sustained the following amended allegation against Father (count b-2): "The children, N[.]P[.] and D[.]P[.]'s father, Justin B[.], has an unresolved history of mental health issues and has been previously diagnosed with Bipolar Disorder. Father has failed to seek

12

services for his mental health and did not take psychotropic medication as prescribed. Father's unresolved mental health issues endangers the children's physical health and safety and places the children at risk of serious physical harm, damage, and danger." In sustaining the allegation against Father, the court acknowledged that Father may not currently suffer from bipolar disorder, but the court expressed concern that Father was "self-diagnosing" and "self-medicating" with marijuana.

The juvenile court declared the children dependents of the court, removed them from parental custody, and ordered them to remain suitably placed under DCFS's supervision. As to Father, the court found "it would be premature to return [N.P. and D.P.] to him" because: "The Court has no information he's enrolled in programming. [¶] The Court also notes that he continues to use marijuana. [¶] The Court notes it is lawful, but given the mental health issues, there are some questions. [¶] In addition, the Court's concern would be separating two of the children and leaving [G.P.] in placement by herself, and the Court notes that [Father] has not followed up with giving the Department an opportunity to assess his current home. [¶] That he is – has been [in] since December and the Court also notes that the Department does not even have a working [phone] number for him."

Counsel for G.P. and N.P. inquired whether the juvenile court was "keeping the same paternity finding with respect to G[.P.]" The court responded, "I am, given the fact that [Father] indicated that he had not had visits for a number of years."[8]

---

[8] This exchange belies Father's assertion the trial court failed to rule on his request for presumed father status as to G.P.

13

The juvenile court ordered reunification services for Mother and Father and monitored visitation with their respective (biological) children, and the court gave DCFS discretion to liberalize the visitation and/or return the children to parental custody. The court ordered Father to complete a case plan consisting of random or on demand drug testing, a parenting program, individual counseling to address case issues, a psychological assessment, mental health counseling, and psychotropic medication, if prescribed.

Father appealed from the January 29, 2020 disposition orders. Thereafter, at a hearing on September 30, 2020, the juvenile court terminated the suitable placement order, placed the three children with Mother, and ordered family maintenance services for Mother and family enhancement services for Father. The court scheduled a section 364 review hearing for March 30, 2021.[9]

## DISCUSSION

### I. Denial of Presumed Father Status

Father contends the juvenile court erred in declining to grant him presumed father status as to G.P. under Family Code section, subdivision (d), which provides, a "person is presumed to be the natural parent of a child" if the person "receives the child into his or her home and openly holds out the child as his or her natural child." (Fam. Code, § 7611, subd. (d).) "A father is not elevated to presumed father status unless he has demonstrated a 'commitment to the child and the child's welfare . . . regardless of whether he is biologically the father.'" (*W.S. v. S.T.* (2018) 20

_____

[9] On the court's own motion, we take judicial notice of the juvenile court's September 30, 2020 minute orders.

14

Cal.App.5th 132, 143.) In the juvenile court, a person requesting presumed parent status bears the burden of proving he or she is a presumed parent by a preponderance of the evidence. (*Glen. C. v. Superior Court* (2000) 78 Cal.App.4th 570, 585-586.)

" 'We review a juvenile court's determination of presumed parentage status under the substantial evidence standard.' " (*In re D.A.* (2012) 204 Cal.App.4th 811, 824.) In reviewing a challenge to the sufficiency of the evidence to support a finding, "the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

Even if Father once held G.P. out as his natural child, substantial evidence in the record demonstrates that by the time of the adjudication/jurisdiction hearing, he no longer did. Father's most recent visits with the children—which were long before the hearing—only included N.P. and D.P. According to Father's testimony, G.P. stopped attending visits with Father and her half siblings because "[s]he was always with her[] so called biological father, or she was with her auntie." Thus, Father acknowledged that the relationship between G.P. and her biological father and relatives prevented him from continuing his relationship with her. And although it appeared that G.P. no longer had a relationship with her biological father by the time of

15

the adjudication/disposition hearing, Father had not resumed his visitation with her. Father did not demonstrate an ongoing commitment to G.P., and substantial evidence supports the juvenile court's denial of his request for presumed father status as to G.P. Absent presumed parent status, Father does not assert he is entitled to placement of or visitation with G.P.

## II. Jurisdictional Finding Against Father

### A. Justiciability of Father's contention

As Father acknowledges, the juvenile court's jurisdiction over N.P. and D.P. will continue, whether or not this court reverses the jurisdictional finding against him, based on the jurisdictional findings against Mother, which are unchallenged on appeal. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 451.) "Because the juvenile court assumes jurisdiction of the child, not the parents, jurisdiction may exist based on the conduct of one parent only. In those situations an appellate court need not consider jurisdictional findings based on the other parent's conduct." (*In re J.C.* (2014) 233 Cal.App.4th 1, 3.)

In his opening appellate brief, Father asks this court to exercise its discretion to review the merits of his challenge to the jurisdictional finding against him, arguing the finding is the basis for the disposition orders (e.g., placement of his children,

16

monitored visitation, and his case plan), and the finding may prejudice him in current or future dependency proceedings.  We may "exercise our discretion to reach the merits of the other parent's jurisdictional challenge in three situations:  (1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction."  (*In re J.C.*, *supra*, 233 Cal.App.4th at p. 4.)  Because the jurisdictional finding against Father is the basis, or at least part of the basis, for disposition orders Father challenges in this appeal (the requirement that he submit to a psychological assessment and the juvenile court's decision not to place N.P. and D.P. with him and to restrict his visitation to monitored visits), we review whether the juvenile court properly made the jurisdictional finding against Father.

> B. **Legal standards for jurisdiction under section 300, subdivision (b) and analysis**

Jurisdiction under section 300, subdivision (b), requires proof "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness . . . ."  (§ 300, subd. (b).) It is undisputed that at the time of the adjudication hearing, N.P. and D.P. had suffered no physical harm or illness.  Thus, jurisdiction in this case required the juvenile court to find by a preponderance of the evidence that there was a substantial risk

17

N.P. and D.P. would suffer serious physical harm or illness in the future as a result of Father's failure or inability to adequately supervise, protect, or provide regular care for N.P. and D.P. because of his mental health issues.  (§ 355 ["Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300"].)

In deciding whether there is a substantial risk of serious physical harm or illness, within the meaning of section 300, subdivision (b), courts evaluate the risk that is present at the time of the adjudication hearing.  "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, abrogated in part on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 627-629; *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 ["When the jurisdictional allegations are based solely on risk to the child, that risk must be shown to exist at the time of the jurisdiction finding"].)  "The juvenile court need not wait until a child is seriously injured to assume jurisdiction if there is evidence that the child is at risk of future harm . . . ." (*Yolanda L.*, at p. 993.)

We review a challenge to the sufficiency of the evidence supporting a jurisdictional finding under the substantial evidence standard of review defined above. (*In re Alexis E.*, *supra*, 171 Cal.App.4th at pp. 450-451.)

Father's own account is the only evidence in the record regarding his history of mental health issues.  As set forth above, Father informed DCFS he was diagnosed with bipolar disorder at 12 years old.  He took psychotropic medication until he was around 16 or 17 years old and chose to stop.  At 23 years old, he

18

chose to stop seeing a mental health provider, after the provider told him he no longer had bipolar disorder, only depression. Father was never hospitalized for a mental health issue. Around the time of the adjudication hearing, he apparently informed DCFS that he used marijuana twice a day to regulate his mood.

Assuming Father had a mental health issue at the time of the adjudication hearing, based on his above-referenced statement regarding the reason for his marijuana use, the "law is settled that harm may not be presumed from the mere fact of a parent's mental illness." (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1050.) DCFS had the burden below of showing how Father's mental illness places N.P. and D.P. at substantial risk of serious physical harm or illness. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.) DCFS failed to satisfy this burden. There is no evidence in the record indicating a mental health issue or Father's marijuana use interfered with Father's ability to function as an adult—e.g., he consistently held jobs for long periods of time—or negatively affected his past care or supervision of the children. Mother offered no statements indicating otherwise.

We reverse jurisdictional finding b-2 because it is not supported by substantial evidence that Father had a mental health issue that placed N.P. and D.P. at substantial risk of serious physical harm or illness. For the same reasons, we also reverse the portion of the disposition orders requiring Father to submit to mental health counseling. We affirm the portion of the disposition orders requiring Father to submit to a psychological assessment, given his admitted history of mental health issues and his use of marijuana to regulate his mood. A juvenile court has "authority to order a nonoffending parent to participate in

19

services." (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1148.) "The problem that the juvenile court seeks to address need not be described in the sustained section 300 petition. [Citation.] In fact, there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order." (*Ibid*.) Father does not ask us to reverse any other portion of his case plan.

## III. Placement of N.P. and D.P.

Father contends he was entitled to custody of his children at disposition under section 361.2, subdivision (a), which provides, in pertinent part: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

Section 361.2, "which governs placement after the child has been made a dependent of the court and removal from the custodial parent has already occurred, conspicuously does not require that the court find the noncustodial parent might fail to protect the child or that there are no reasonable means to protect the child in the noncustodial parent's home in order to deny the noncustodial parent's request for placement. Instead, section 361.2 simply instructs the court to consider whether placement with the noncustodial parent would be 'detrimental to the safety, protection, or physical or emotional well-being of the child.' A

20

detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425, italics omitted.)

"A court's ruling under section 361.2, subdivision (a) that a child should not be placed with a noncustodial, nonoffending parent requires a finding of detriment by clear and convincing evidence. [Citation.] We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that . . . the children would suffer such detriment." (*In re Luke M., supra,* 107 Cal.App.4th at p. 1426.)

Substantial evidence demonstrates that placement with Father at disposition would have been detrimental to N.P. and D.P. because Father's conduct showed he was not prepared to assume custody. On November 25, 2019, Father informed DCFS he was not ready for the children to be placed with him due to his housing situation. At the January 29, 2020 adjudication/disposition hearing, Father stated for the first time that he was ready for the children to be placed with him, and he asked the juvenile court to make the order the same day. Although Father had moved into a new apartment the month before, he had not asked DCFS to assess the home for placement, nor had he provided the new address to DCFS. He conceded that he had ignored some of DCFS's calls. Father had not provided DCFS with any information regarding the three other people with whom he shared his apartment. His testimony demonstrated that while he was in the process of finding someone who could watch the children while he worked weekday evenings

and weekend mornings, he had not finalized such a plan or discussed it with DCFS.

The juvenile court did not err in declining to place N.P. and D.P. with Father and instead ordering them suitably placed. Substantial evidence demonstrates that placement with Father at disposition would have been detrimental to N.P. and D.P. given the uncertainty regarding Father's housing situation and childcare plan and his inability or unwillingness to keep DCFS apprised of his whereabouts and to return DCFS's calls.[10] As set forth above, the court granted DCFS discretion to return the children to Father's custody should his circumstances change.

## IV. Visitation With N.P. and D.P.

Father contends he was entitled to an order granting him unmonitored visitation with N.P. and G.P. at disposition.

"In all cases in which a minor is adjudged a dependent child of the court on the ground that the minor is a person described by Section 300, the court may limit the control to be exercised over the dependent child by any parent . . . . The limitations may not exceed those necessary to protect the child." (§ 361, subd. (a)(1).) We review a juvenile court's visitation order for abuse of discretion. (*In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465.)

---

[10] Moreover, it appears that Father's challenge to the suitable placement order for N.P. and D.P. is moot. As set forth above, on September 30, 2020, the juvenile court terminated that order and placed the three children with Mother, the parent with whom they resided before these dependency proceedings commenced. We cannot reverse an order that no longer exists and that has been replaced by a subsequent placement order.

The juvenile court did not abuse its discretion in restricting Father to supervised visitation with N.P. and D.P. As discussed above, Father failed to provide DCFS with his address for a month, and he failed to return DCFS's phone calls. At the time of the adjudication/disposition hearing, DCFS did not have a current telephone number for Father, and Father only provided it when DCFS asked during Father's testimony if the number DCFS had on file was current. DCFS could not ensure N.P. and D.P.'s protection if Father was unreachable during unmonitored visitation with the children. Monitored visitation was an appropriate limitation on Father's contact with N.P. and D.P. until Father demonstrated he could abide by the rules of DCFS's supervision of the children.

## DISPOSITION

The jurisdictional finding against Father (count b-2) and the portion of the disposition orders requiring Father to submit to mental health counseling are reversed. In all other respects, including the requirement that Father submit to a psychological assessment, the disposition orders are affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.          FEDERMAN, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.